[Cite as *State v. Howard*, 2011-Ohio-3524.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

**STATE OF OHIO,**

    **PLAINTIFF-APPELLEE,**                 **CASE NO. 9-10-50**

    **v.**

**JODY HOWARD,**                     **O P I N I O N**

    **DEFENDANT-APPELLANT.**

Appeal from Marion County Common Pleas Court
Trial Court No. 09-CR-345

**Judgment Affirmed**

**Date of Decision: July 18, 2011**

**APPEARANCES:**

    *Kevin P. Collins* **for Appellant**

    *Brent Yager and Denise M. Martin* **for Appellee**

**PRESTON, J.**

{¶1} Defendant-appellant, Jody Dean Howard (hereinafter "Jody" or "Howard"), appeals the Marion County Court of Common Pleas' judgment of conviction. For the reasons that follow, we affirm.

{¶2} This case stems from Howard's sexual victimization of his sister-in-law, S.S., who was less than 13 years of age at the time of the incidents, his creation of obscene pornographic material involving S.S., his possession of child pornography, and his complicity in destroying the obscene pornographic material involving S.S. following his indictment for the same.

{¶3} On July 23, 2009, the Marion County Grand Jury indicted Howard on 50 Counts, including: Counts 1-40 of rape, violations of R.C. 2907.02(A)(1)(b) and first degree felonies; and Counts 42-50 of gross sexual imposition, violations of R.C. 2907.05(A)(4) and third degree felonies. (Doc. No. 1). On July 27, 2009, Howard was arraigned and entered pleas of not guilty. (Doc. No. 4).

{¶4} On February 18, 2010, the Marion County Grand Jury further indicted Howard on 53 Counts, including: Count 51 of pandering obscenity involving a minor in violation of R.C. 2907.321(A)(1), a second degree felony; Counts 52-76 of pandering obscenity involving a minor, violations of R.C. 2907.321(A)(5) and fourth degree felonies; Counts 77-102 of illegal use of a minor in nudity-oriented

material or performance, violations of R.C. 2907.323(A)(1) and second degree felonies; and Count 103 of complicity to tampering with evidence in violation of R.C. 2923.03(A)(4), 2921.12(A)(1), a third degree felony. (Doc. No. 58).

{¶5} On February 19, 2010, Howard filed a motion to sever Counts 1-50 from Counts 51-103 pursuant to Crim.R. 12(C)(5), Crim.R. 14, and Crim.R. 8. (Doc. No. 60). On February 22, 2010, Howard was arraigned on the supplemental indictment and entered pleas of not guilty. (Doc. No. 62).

{¶6} On March 5, 2010, the State filed a motion to dismiss Counts 4-40 and Counts 44-50 of the original indictment and also filed its response to the Howard's motion to sever. (Doc. Nos. 68-69). On March 8, 2010, the trial court dismissed Counts 4-40 and Counts 44-50 without prejudice. (Doc. No. 70). On May 19, 2010, the trial court denied Howard's motion to sever. (Doc. No. 89).

{¶7} A jury trial was held from June 28th to July 6, 2010. (Doc. Nos. 140, 146-48). Thereafter, the jury found Howard guilty on Counts 1-3, 41-43, and 51-103. (Doc. Nos. 148-208).

{¶8} On August 19, 2010, the trial court sentenced Howard to: 9 years imprisonment on each of Counts 1-3 of rape; 2 years imprisonment on each of Counts 41-43 of gross sexual imposition; 4 years imprisonment on Count 51 of pandering obscenity involving a minor; 12 months on each of Counts 52-76 of pandering obscenity involving a minor; 12 months on each of Counts 78-102 of

illegal use of a minor in a nudity-oriented material or performance; and 1 year on Count 103 of complicity to tampering with evidence. (Doc. No. 219). No sentence was imposed on Count 77 since it was an allied offense. (Id.). The trial court further ordered that: the terms imposed in Counts 1-3 should be served consecutively to each other; the terms imposed in Counts 41-43 should be served concurrently to each other and consecutively to Counts 1-3; the term imposed on Count 51 should be served consecutively to Counts 1-3; the terms imposed on Counts 52-76 should be served concurrently to each other and consecutively to Counts 1-3; the terms imposed on Counts 78-102 should be served concurrently to each other and consecutively to Counts 1-3; and Count 103 should be served consecutively to Counts 1-3, for an aggregate sentence of 36 years. (Id.).

{¶9} On September 20, 2010, Howard filed a notice of appeal. (Doc. No. 221). Howard now appeals raising twelve assignments of error for our review. We elect to address Howard's first assignment of error out of the order presented in his brief and to combine his assignments of error where appropriate.

## ASSIGNMENT OF ERROR NO. II

**THE RECORD CONTAINS INSUFFICIENT EVIDENCE TO SUPPORT DEFENDANT-APPELLANT'S CONVICTION FOR PANDERING OBSCENITY INVOLVING A MINOR IN VIOLATION OF R.C. 2907.321(A)(1) [COUNT 51].**

## ASSIGNMENT OF ERROR NO. III

**THE RECORD CONTAINS INSUFFICIENT EVIDENCE TO SUPPORT DEFENDANT-APPELLANT'S CONVICTION FOR PANDERING OBSCENITY INVOLVING A MINOR IN VIOLATION OF R.C. 2907.321(A)(5) [COUNTS 52-76].**

**ASSIGNMENT OF ERROR NO. IV**

**THE RECORD CONTAINS INSUFFICIENT EVIDENCE TO SUPPORT DEFENDANT-APPELLANT'S CONVICTION FOR ILLEGAL USE OF [A] MINOR IN A NUDITY-ORIENTED MATERIAL OR PERFORMANCE IN VIOLATION OF R.C. 2907.323(A)(1) [COUNT 77].**

**ASSIGNMENT OF ERROR NO. V**

**THE RECORD CONTAINS INSUFFICIENT EVIDENCE TO SUPPORT DEFENDANT-APPELLANT'S CONVICTION FOR ILLEGAL USE OF [A] MINOR IN A NUDITY-ORIENTED MATERIAL OR PERFORMANCE IN VIOLATION OF R.C. 2907.323(A)(3) [COUNTS 78-102].**

**ASSIGNMENT OF ERROR NO. VI**

**DEFENDANT-APPELLANT'S CONVICTION FOR RAPE IS CONTRARY TO THE MANIFEST WEIGHT OF EVIDENCE. [COUNTS 1-3].**

**ASSIGNMENT OF ERROR NO. VII**

**DEFENDANT-APPELLANT'S CONVICTION FOR GROSS SEXUAL IMPOSITION IS CONTRARY TO THE MANIFEST WEIGHT OF EVIDENCE. [COUNTS 41, 42, AND 43].**

**ASSIGNMENT OF ERROR NO. VIII**

**THE RECORD CONTAINS INSUFFICIENT EVIDENCE TO SUPPORT DEFENDANT-APPELLANT'S CONVICTION FOR COMPLICITY TO TAMPERING WITH EVIDENCE. [COUNT 103].**

{¶10} In assignments of error two through five and eight, Howard argues that the State presented insufficient evidence to support his convictions for pandering obscenity involving a minor, illegal use of a minor in a nudity oriented material or performance, and complicity to tampering with evidence. In his sixth and seventh assignments of error, Howard argues that his convictions for rape and gross sexual imposition were against the manifest weight of the evidence.

{¶11} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks* (1981), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, superseded by state constitutional amendment on other grounds in *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668. Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id.

{¶12} On the other hand, a reviewing court must examine the entire record, "'[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier

of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered'" to determine whether a conviction is against the manifest weight of the evidence. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 227 N.E.2d 212.

{¶13} Marion County Sheriff's Deputy David Barron testified that he was working as a dispatcher answering 9-1-1 calls on July 7, 2009 from 11:00 p.m. to 7:00 a.m. (June 28-30 and July 1-2, 2010 Tr. at 301-02). He testified that, around 11:13 p.m., he received a 9-1-1 call from Bret S., the victim's father, reporting a sexual problem between an adult and a juvenile at 3927 Smeltzer Road in Marion, Ohio. (Id. at 302-03). Deputy Barron identified State's exhibit two as a true and accurate copy of the 9-1-1 phone conversation. (Id. at 303-04).

{¶14} Detective Thomas Miller of the Marion County Sheriff's Office testified that, on July 7, 2009, he was dispatched to 3927 Smeltzer Road for a family altercation over a sex offense. (Id. at 304-05). When Detective Miller arrived on the scene, Bret pulled in behind his cruiser, exited his vehicle, and stated that his son-in-law, Howard, was inside the residence with a gun,

threatening to commit suicide. (Id. at 305-06). When Detective Miller and Bret went into the residence, they found Howard sitting in a chair and his wife, Nikki Howard ("Nikki"), sitting on Howard's lap facing him and holding his arms down to the chair. (Id. at 306). Nikki was upset, crying, and yelling at Howard to calm down, relax, and that killing himself was not the answer. (Id.). Detective Miller testified that Howard had a blank expression on his face, and that he could tell something was wrong, though Howard was not saying anything. (Id.). Nikki told Detective Miller that she had hid the weapon from Howard, but, as Detective Miller approached Howard to place him in handcuffs for his safety, Howard stated he was going to try to take Detective Miller's service weapon so he could shoot himself if Detective Miller came any closer to him. (Id. at 307-08). At that point, Detective Miller backed up, drew his Taser, and called for back-up. (Id. at 308). A few minutes later, Howard told Nikki to let go of his arms, Howard placed his hands out, looked at Detective Miller, and told him to take him to jail before he changed his mind. (Id. at 308-09). Detective Miller secured Howard and placed him in his cruiser under supervision, and then he returned to the residence to secure the weapon that Nikki had hid from Howard. (Id. at 310). At that point, Deputy Dutton arrived on the scene and was asked to supervise Howard, while he and Major Corwin spoke with Bret and Nikki about why Howard wanted to commit suicide. (Id. at 310-11).

{¶15} Detective Miller testified that, although hesitant at first, Nikki and Bret stated that they had some suspicion that something was going on between Howard and Nikki's 12-year-old sister, S.S. (Id. at 312). Nikki and Bret told Detective Miller that S.S. would hang around Howard too much, and S.S. was not playing enough with the other kids. (Id.). They further stated that S.S. liked to play X-box and get ice cream with Howard. (Id.). Nikki stated that her mother, Jane, had borrowed her vehicle earlier that day, and they learned that Jane was at a bar consuming alcohol. (Id. at 312-14). According to Nikki, when they went to get Jane, Jane made a comment about something going on between Howard and S.S. (Id. at 312-14). As a result of that comment, Nikki confronted S.S. when they were on their way home from the bar. (Id. at 315). Detective Miller testified that Nikki, however, refused to provide a recorded statement. (Id.). Detective Miller testified that, during his investigation, he discovered Howard was born in February 1977. (Id. at 318). He further testified that he spoke with S.S., though she was reluctant to talk to him, so he suggested to Major Corwin that S.S. speak to a female deputy. (Id. at 319).

{¶16} On cross-examination, Detective Miller testified that Nikki told him that the "something" going on between Howard and S.S. was that they were flirtatious with one another. (Id. at 322). He testified that a rape kit was done on S.S. that night at the hospital. (Id. at 326). Detective Miller further testified that

S.S. stated that she made statements to Brianna Burge, her best friend from school, but Burge was never questioned. (Id. at 326-27).

{¶17} Marion County Sheriff's Deputy Jason Dutton testified that he was dispatched to 3927 Smeltzer Road, Marion County, Ohio on July 7, 2009 for a possible attempted suicide. (Id. at 329). Deputy Dutton testified that he was responsible for supervising Howard while Howard was restrained in the back of the police cruiser, and that he witnessed Howard attempt to strangle himself while in the back of the cruiser. (Id. at 329-31). After that occurred, Deputy Dutton handcuffed Howard's hands behind his back. (Id. at 339). Deputy Dutton further testified that he interviewed Howard at the multi-county correctional facility regarding the alleged sexual offense that occurred between him and S.S. (Id. at 331-32). Deputy Dutton identified State's exhibit three as a true and accurate copy of that interview. (Id. at 332). Deputy Dutton testified that Howard repeatedly denied that anything happened between him and S.S., and that he ultimately charged Howard with persistent disorderly conduct and menacing. (Id. at 341). Deputy Dutton testified that Howard avoided eye contact during the interview, though he denied doing anything wrong. (Id. at 342-33).

{¶18} Amber Davis, a Verizon Wireless employee, identified State's exhibit four as the cell phone records of phone numbers 740-360-7009, belonging to Bret S., and 740-262-3719, belonging to Howard. (Id. at 344-45). Davis

testified that exhibit four contained the contents of text messages between the two phone numbers, though she testified on cross-exam that the records do not indicate who actually sent the text messages. (Id. at 352, 355).

{¶19} Jane S. testified that she has four daughters: Nikki Howard (29), Christi S. (21), S.S. (13), and Bretta S. (11). (Id. at 361-62). Jane testified that S.S. was born in September 1996. (Id.). Jane testified that she lived with Nikki and Jody Howard at 3927 Smeltzer Road from April to July 2009, and that, around 10:30 a.m. on July 6, 2009, she woke up to find S.S. missing from the bed next to her. (Id. at 364-65). Jane testified that she went looking for S.S. in the house, but could not find her, and when she went by Howard's bedroom, she heard the bed "squeaking and stuff * * * just like somebody was in there having sex." (Id. at 366). Jane testified that she then went back downstairs to try to find S.S., but still could not find her, so she went back upstairs to continue her search for S.S. (Id. at 365). When she came back upstairs, she saw Howard leave his bedroom in his underwear with his hands cupped over his privates heading towards the guest bathroom. (Id.). Jane testified that she yelled for S.S., and S.S. yelled back, "mom, I'm back here in the closet," meaning Ariel's (Jody and Nikki Howard's daughter's) closet. (Id). Jane testified that she had already looked in Ariel's closet when she was upstairs the first time, and S.S. was not there, so she took S.S. outside of the house and told S.S. that she was not in Ariel's closet. (Id. at 366).

Jane testified that she asked S.S. if she was in Howard's room, and S.S. said "yes." (Id.). Jane testified that she "just left it at that, [a]nd she knew what was going on * * * [b]ecause of the way [S.S.] and [Howard were] so chummy together and everything." (Id.). Jane further testified that she discovered blood in S.S.'s underwear once, even though S.S. had not yet begun her menstrual cycle. (Id. at 366-67). Jane testified that she then became suspicious that something might be happening at Nikki and Jody's house, so she moved there to keep her eyes on things. (Id. at 367).

{¶20} Jane testified that her husband, Bret's, cell phone number was 360-7009. (Id.). She further testified that she does not even know how to turn on a computer. (Id.) Jane testified that Howard has taken the children, including S.S., swimming at the YMCA. (Id. at 368). Jane testified that she borrowed Nikki's van to attend a friend's funeral, and, afterwards, she went to The Frosty Mug bar. (Id. at 368). Jane testified that Bret and Nikki showed up to get the van, and that she yelled "she'd better clean up her own back door between her husband and my baby, [S.S.]," as Nikki was driving away. (Id. at 369).

{¶21} On cross-examination, Jane testified that Bret and she are in the middle of a divorce where custody of S.S. is in dispute. (Id. at 370, 393-94). She testified that Bret and she own property at 658 Buena Drive, but that she moved in with Nikki and Jody Howard "to protect [her] daughter." (Id. at 370-72). Jane

-12-

testified that she never reported her suspicions of Howard to children services, the police, the prosecutor's office, or the sheriff's department, even though she was positive that S.S. and Howard had sex on July 6th. (Id. at 372). When asked why she did not take S.S. to the hospital at that time, Jane testified that Bret would not let her, and Bret, in fact, went motorcycle riding with Howard that same day. (Id. at 373). Jane testified that, when she confronted S.S. about finding the blood in her panties, S.S. stated it was from her rectum, though Jane never took S.S. to a physician. (Id. at 373-74). Jane admitted that she allowed S.S. to live with Howard for three to four months while she was supervising. (Id. at 374). Jane admitted that she was drunk when she yelled the allegations against Howard when Nikki and Bret came to the bar to retrieve the van. (Id. at 375). Jane testified that S.S. wears underwear regardless of S.S.'s statements to the contrary. (Id. at 396-97). Jane also testified that children services had initiated a case for S.S., though she denied that her testimony was her effort to protect her interests in the custody dispute with her husband or children services. (Id. at 394-95). Jane testified that she did not actually find S.S. in the bedroom having sex with Howard, and Jane denied ever telling S.S. that she would not tell Nikki about them having sex if S.S. promised to stop. (Id. at 397-98). Jane testified that she was never on the computer, and she has no knowledge of an online order at Sears for shoes and a hooded sweatshirt that was placed on a credit account she shared with Bret. (Id. at

-13-

400). Jane testified that she never saw Howard fondle or touch S.S. in a sexual manner, though she saw them play games together on the T.V. (Id. at 403-05). On re-direct, Jane testified that she told Bret several times that she thought something was going on between Howard and S.S., and that S.S. stated that she was in Howard's room. (Id. at 408-09).

{¶22} Abbigail Dindo, a paralegal at the Marion County Prosecutor's Office, testified that she monitored Howard's jailhouse phone conversations. (Id. at 411-13). Dindo identified: State's exhibit five as a CD of thirteen phone calls she downloaded from the jail call system; State's exhibit six as a copy of her narrative report; and State's exhibit seven as a printout of the calls that were downloaded. (Id. at 413-17).

{¶23} Nikki Howard was called but refused to testify at trial. (Id. at 420, 426).

{¶24} Bret testified that he has four daughters: Nikki (29), Christi (21), S.S. (13), and Bretta (11), and that S.S. was born in September 1996. (Id. at 428-30). Bret testified that Howard married his oldest daughter, Nikki, and that a year ago he was living with Nikki, Howard, and their children on Smeltzer Road. (Id.). Bret testified that he was at Nikki and Jody's house on July 6, 2009, and he recalled Jane mentioning that S.S. was in Howard's bedroom, but Jane never indicated she saw or heard anything or that she thought something was going on

between Howard and S.S. (Id. at 435).  Bret further testified that Jane never told him that S.S. admitted she was in Howard's bedroom. (Id. at 436).  Bret testified that, on July 7, 2009, Jane took Nikki's van to attend a funeral, and that, between 10 to 11 p.m. that night, Nikki, Bretta, S.S., and he went to The Frosty Mug to get the van back from Jane. (Id. at 436-37, 439).  Bret testified that he went inside the bar to get the van keys from Jane, and Jane came out of the bar and began arguing with Nikki. (Id. at 440).  Bret testified that Jane made an accusation that Howard was molesting S.S., and Nikki stated that she was "going to go home and get to the bottom of this." (Id. at 441-42).  Bret testified that he asked Christi to pick up S.S. from the house, but he did not go back to the house, but instead, met Christi at Pleasant School, which is one or two miles from the house on Smeltzer Road. (Id. at 443-45).  At some point thereafter, Nikki told him that Howard wanted to kill himself, and Nikki asked him to contact Wanda, Jody's mother. (Id. at 446-47).  Bret testified that, at some point, he received a text from Nikki indicating that Howard had sex with S.S. (Id. at 447-48).  Bret testified that he then called 9-1-1, and he identified State's exhibit two as his 9-1-1 phone call. (Id. at 450-51).

{¶25} Bret testified that, when the deputy sheriff arrived, he pulled in behind him and went into the house with him where he saw Nikki and Jody sitting in the chair. (Id. at 452).  Bret testified that Howard was seated normally, but Nikki was sitting on Howard's lap facing him with her hands on Howard's wrists.

(Id. at 453). Bret testified that Howard told the deputy to stay away from him, though he could not recall whether Howard threatened to take the deputy's service weapon. (Id. at 454). Before back-up arrived, Howard stated "just go ahead and take me." (Id. at 455). Bret testified that he talked with Deputy Miller at the hospital about the suspicions that Jane had about Howard and S.S. (Id. at 458). Bret testified that he never saw anything occur between Howard and S.S., though he did tell S.S. to keep her hands to herself when she was around Howard. (Id. at 459). Bret identified State's exhibit nine as the recorded conversation Christi and he had with Deputy Miller on July 7, 2009. (Id. at 461). Bret testified that he recalled hearing a phone conversation between Howard and Nikki that occurred shortly after Howard's arrest where Howard apologized for what was happening, though Bret could not tell what Howard apologized for exactly. (Id. at 462). Bret believed he recalled that, during this same conversation, Howard stated that his career was over and he just wanted to die. (Id. at 462-63). Bret identified: State's exhibit ten as a teddy bear and State's exhibit eleven as a jewelry box, both items that S.S. stated Howard gave to her. (Id. at 466-67). Bret testified that Howard has taken S.S. and the other children swimming at the YMCA. (Id. at 468).

{¶26} On cross-examination, Bret testified that he had a pending divorce with Jane where the custody of their minor children is in dispute, and children services had a pending case involving S.S. (Id. at 469-70). Bret testified that Jane

is not very savvy with electronics, but he never ordered anything online from Sears. (Id. at 473-74). Bret testified that he never saw Howard inappropriately touch S.S., though he did testify that S.S. would hit Howard as "funny games," stating things like "you goober" or "you Barney." (Id. at 474-75). Regarding the July 6th incident, Bret testified that he was sleeping in bed at the time, and Jane never mentioned that she saw S.S. have sex with Howard. (Id. at 475-76). Bret testified that he asked Jane where the family's dog was in the house, because he thought Jane might have heard the dog jumping on the bed. (Id. at 476-77). Bret testified that Jane was at the house that night because she was going to babysit the children the next day, not because she was there to protect the children. (Id. at 478). Bret testified that he asked Christi to take S.S. to the hospital to prove that nothing was going on between them, because he did not believe Jane because she only made these allegations against Howard when she was drunk. (Id. at 481). Bret testified that Nikki and Jody bought all the kids Valentine's gifts. (Id. at 483-84).

{¶27} Bret testified that, at some point, he talked to an attorney, John Firstenberger, because S.S. changed her story. (Id. at 485-89). Firstenberger called another attorney, Matthews, who eventually shared this information with Prosecutor Yager. (Id.). Bret testified that Prosecutor Yager called him, and he told Prosecutor Yager that S.S. told him nothing ever happened between Howard

and her. (Id. at 490). Bret testified that he never encouraged S.S. to change her story, and Bret denied ever knowing that S.S. had sex with Howard. (Id. at 491, 494). Bret testified that he never told S.S. that he would not tell Nikki if she would stop having sex with Howard. (Id. at 494-95). Bret testified that S.S. and Howard played X-box together, and that S.S. would play with Howard while the other children would not. (Id. at 499). Bret testified that, when Howard took S.S. to school, Howard's two other girls would go with them as well. (Id. at 498). Bret testified that he would have beat up or shot Howard if he knew that Howard was having sex with S.S. (Id. at 502). On re-direct, Bret testified that Howard also gave S.S. a necklace. (Id. at 507).

{¶28} Major Aaron Corwin of the Marion County Sheriff's Office testified that he was dispatched to 3927 Smeltzer Road on July 7, 2009 after 11:00 p.m. for a suicidal subject with a gun. (Id. at 515-26). Major Corwin testified that he has known Howard for years since Howard was involved in corrections and law enforcement. (Id. at 517). He testified that he spoke with Nikki and Bret and learned of the allegation that Howard was having sex with S.S. (Id. at 518). According to Major Corwin, Nikki stated that S.S. admitted that she had sex with Howard, while Howard admitted something happened but would not be specific. (Id.). Major Corwin testified that Nikki informed him that Howard became enraged and suicidal and attempted to ram his head through a plate glass window

-18-

or door after S.S. admitted she had sex with Howard. (Id. at 518-19). He further testified that Bret and Nikki stated that Howard took S.S. for ice cream and to school alone, and that Howard played X-box with S.S. but not the other children. (Id. at 520). Major Corwin identified State's exhibit twelve as the audio recording of his interview with Howard. (Id. at 521). On cross-examination, Major Corwin testified that Bret indicated that Howard took S.S. to school alone, although that was not in his report. (Id. at 534).

{¶29} The victim, S.S., testified that she is thirteen years old and was born in September 1996. (Id. at 538). She testified that she played X-box with Howard; Howard gave her a motorcycle ride; Howard took her to school; and Howard took her swimming at the YMCA. (Id. at 541-42). S.S. testified that Howard would take the other children to school and the YMCA when they went. (Id.). S.S. testified that she was not in Howard's bedroom on July 6, 2009, but instead, was in the kids' bedroom. (Id. at 543-44). S.S. testified that, on July 7, 2009, Nikki, her dad, and she went to The Frosty Mug at night, and her mother, Jane, made an accusation that Howard and she had sex. (Id. at 545-46). S.S. testified that Nikki asked her in the car whether she had sex with Howard, but she did not say anything. (Id. at 547). S.S. testified that Nikki continued to question her at the house, but she did not say anything. (Id. at 548). S.S. admitted that she said she loved Howard as a boyfriend previously, but she was not telling the truth then.

(Id.). S.S. denied that she was trying to help Howard while testifying, and she testified that Howard started talking about killing himself after Nikki finished talking to her at the house. (Id. at 549). S.S. testified that she did not know why Howard wanted to kill himself. (Id. at 550). S.S. testified that she could not remember telling Christi that she loved Howard or telling Christi that Howard and she were going to live in Florida together when she turned eighteen. (Id.). S.S. testified that she told Nurse Russell she had sex with Howard, and that she may have told Russell that she could not stand to be apart from Howard. (Id. at 552-53). S.S. testified that Russell did a physical exam. (Id. at 555). S.S. testified that she told Deputy Miller that she had sex with Howard, but that statement was not true. (Id. at 556-57). S.S. identified State's exhibit thirteen as the audio recording of her interview with Deputy Miller. (Id. at 558-59). S.S. testified that she talked to Deputy McDonald, but the things she stated during the interview were false. (Id. at 560-61). S.S. identified State's exhibit fourteen as her recorded interview with Deputy Amy McDonald. (Id. at 564, 566). S.S. further testified that she told prosecutors that Howard: kissed her, touched her breasts, touched her private parts, put his finger in her vagina, and put his penis into her mouth. (Id. at 569-573). S.S. testified that she knew that Howard could get in trouble when she made those statements. (Id. at 574). S.S. testified that she told prosecutors that Howard would ejaculate on her stomach, on her face, or in her mouth, but that those

statements were also not true. (Id. at 580). S.S. testified that she told prosecutors that she preferred to refer to sex as "making love." (Id.). S.S. testified that she recalled testifying at Grand Jury that Howard took her virginity. (Id. at 583). S.S. testified that Nikki's family gave her the Teddy Bear, though she acknowledged that she had stated earlier it was from Howard. (Id. at 585). S.S. testified that the jewelry box was a gift from Nikki's family, though the notes in the jewelry box stated "I will love you forever and always" and the back of the note said "Do not cry. I'm not going anywhere." (Id. at 586-87). S.S. testified that the third note in the jewelry box stated, "[t]his shiny 5 cents was in my pocket for the first time I told you that I love you." (Id. at 588). S.S. identified State's exhibit sixteen as a broken CD that she obtained from Howard's house, which contained songs Howard had written. (Id. at 588-89). S.S. testified that Howard gave her the CD, but denied that he wrote the songs for her. (Id. at 590).

{¶30} S.S. testified that she chatted with Howard on MySpace. (Id. at 591). S.S. identified: State's exhibit seventeen as a MySpace chat she had with Howard on December 23, 2008; State's exhibit eighteen as a MySpace chat she had with Howard on February 1, 2009; and State's exhibit nineteen as a MySpace chat she had with Howard on February 7, 2009. (Id. at 591-95). The contents of these chats were read into the record, without objection, with the prosecutor reading Howard's

messages and S.S. reading her responses. (Id. at 591-600). The December 23-24,

2008 MySpace chat between S.S. and Howard was as follows:

> **[Howard]: miss me yet? lolo**
> **[S.S.]: sure**
> **[Howard]: wow that convencing**
> **[S.S.]: thank you i was going to write u but my myspace would not show nothing not even my home page i logged out and logged back and it still would not work.**
> **[Howard]: that makes me feel a tad bit better. U should miss ur bro in law all da time. Whatcha doin? getting better at golf?**
> **[S.S.]: no, dad took the T.V. THE PEOPLE DID NOT TAKE MY MUSIC OFF MY MYSPACE**
> **[Howard]: two goods…now u get to talk to me and good u still have ur playlist for a few more mins hehe. Miss me yet?**
> **[S.S.]: sure the kids want to say hi HI DAD I LOVE U**
> **[Howard]: tell em i love em … and u need to admit it i flow thru ur vains like fish in the sea!**
> **[S.S.]: HA HA VERY FUNNY how is nikkie doing**
> **[Howard]: close to popping a kid out…but right now im mackin on her sister lol**
> **[S.S.]: ok butt chin what does that mean**
> **[Howard]: what part u not understand ? the mackin or the poppin? mackin means flirting popping means like popcorn…**
> **[S.S.]: k thank u butt chin**
> **[Howard]: it's all good wall model**
> **[S.S.]: who sings the song Sorry, Candy shop, and Cyclone**
> **[Howard]: flirt back and i will tell ya…**
> **[S.S.]: noooooooooooooooooooooooooooooooooooooo!**
> **[Howard]: sorry i dont know then…**
> **[S.S.]: if u do not tell me then i am getting off the myspace**
> **[Howard]: ur nephue is born…good looking boy like his dad**
> **[S.S.]: congratulations is he coming here tonight?**
> **[Howard]: tomorrow at 10am so b ther if you wanna see the pimp**
> **[S.S.]: i saw the baby boy and looks nothing like u he looks to cute**
> **[Howard]: fu**

[S.S]: u hurt my feelings butt chin
[Howard]: how does it feel? not good huh…yeah now what
[S.S.]: ok

(June 28-30 and July 1-2, 2010 Tr. at 591-93); (State's Ex. 17). The February 7,

2009 MySpace chat between S.S. and Howard was as follows:

[S.S.]: hi wat r u doing
[Howard]: talking to you…i guess…u need to stop getting in trouble…
[S.S.]: sorry thats how i roll.
[Howard]: STOP freakin rolling then…going a week with no half pint sucks a lot
[Howard]: where you at?
[S.S.]: MY FRIEND KIERSTINS HOUSE I AM STAYING THE NIGHT WITH HER
[Howard]: nice..so you can talk for a min.  Ur dad gave the ok for you to stay tomorrow with us i was told.  Not sure whats up with him but this BS needs to stop.  Seems if you guys get in trouble he knows you like coming here and doing stuff with us so that's the first thing they take away when your bad
[S.S.]: Christi is not inviting me to her baby shower y can u only talk to me for a min
[Howard]: I took sleeping meds..but i will try to stay up as long as i can.  Not like I ever get to talk to you…brat
[S.S.]: well i am not a brat i did nit think u would be on myspace i just got back from the zommers roller skating rink
[Howard]: U R A brat because you get into trouble and spoil the good times.  Your not missing much anyway cant start the bike because ron needs to get a new battery for it.  other than that i been bored out of my mind.
[S.S.]: thats funny but not good the bike can not start up
[Howard]: i had it started but battery went completely dead and wont turn over now.  Bad cell in battery he said he would get a new one and give me a new switch for the neons.  NOT FUNNY EITHER half pint~
[S.S.]: well i have to call my parents to pick me up because i want to go home

[Howard]: dont wanna come here?

[S.S.]: idk r ur kidz awake

[Howard]: yes…nikkie is out and about too…but u dont have to if you don't want to.

[S.S.]: i have no ride their i have to ask my dad but i have no way to get a hold of him

[Howard]: call nikkie to pick you up…ur dad was suppose to tell you next time he seen you that if you wanted to spend the night to call her.

[S.S.]: i know he did tell me

[Howard]: like i said though if you dont want to its all good.  Not going to twist ur arm~

[S.S.]: lol

[Howard]: I do miss seeing you though…but I guess i can go another week slamming my head in the wall…

[S.S.]: i am coming over

[Howard]: YAY!!!..(does a flip) … err i mean….umm cool~

[S.S.]: me and nikkie is going to the store first

* * *

[Howard]: Work bites.

[S.S.]: y r u bored

[Howard]: yes very much so…at least i got to see ya for a few mins

[S.S.]: i know

[Howard]: felt good

[S.S.]: oh i think i am spending the night

[Howard]: goody

* * *

[Howard]: erase all ur messages and change ur pass Shes looking to far into things again * * * Ur sis asking me why i dont tell her i miss her but tell u lmao! * * * u letting ur sister read ur messages or something?  When u check these could u please get on myspace and delete all of mine.  I would but i can only do one at a time on my phone and seems to be no way to delete trash bin. Thanks half pint love ya!

(June 28-30 and July 1-2, 2010 Tr. at 596-600); (State's Ex. 19).  S.S. testified

that she could not remember telling her sixth grade teacher that her boyfriend

gave her a teddy bear. (Id. at 601). S.S. testified that she lied about Howard to get her dad to come back home. (Id. at 603).

{¶31} On cross-examination, S.S. testified that she told the judge she lied and none of these things happened. (Id. at 608-09). S.S. testified that no one instructed her how to testify at trial. (Id. at 610). She testified that Howard gave her the CD of songs after she asked for it, and Howard did not just give it to her. (Id. at 617-18). She testified that the notes in the jewelry box were from Nikki and Jody. (Id. at 620). S.S. testified that Howard's comment about seeing the "pimp" during the MySpace chat was in reference to Howard's son, not him. (Id.). S.S. testified that she: received all A's and two B's in school; was never suspended from school; served on the cheerleading team; and never saw a psychiatrist, psychologist, therapist, or counselor. (Id. at 621-22). S.S. testified that she could not remember the details of what actually happened because she had told so many lies. (Id. at 624-25). S.S. testified that Howard took the other kids to the pool and for ice cream when she went with him. (Id. at 626). S.S. testified that she told the prosecutor that she lied and wanted the charges against Howard to be dropped. (Id. at 628). She testified that Howard never texted her sexual things, and that all the kids and Nikki play X-box with Howard, too. (Id. at 639, 641).

{¶32} Christi S. testified that S.S. is her sister whose nickname is "Bree," and Bret and Jane are her parents. (Id. at 651). Christi testified that, on July 7,

2009, she was driving around town trying to find her mom and eventually located her at The Frosty Mug. (Id. at 652). Christi testified that her mom came out of the bar "raging she knew what was going on, that she was gonna get Jody done, she knew they were having sex." (Id.). Christi testified she text messaged Nikki after they left the bar and asked her if she wanted her to pick up the kids. (Id. at 653). Christi testified that Nikki then sent her a text message indicating that S.S. had sex with Howard. (Id. at 654). Christi testified that she then went to the house to pick up S.S. and Bretta because her dad told her to take the kids to the emergency room. (Id.). Christi testified that, while they were riding to the emergency room, S.S. stated that she loved Howard and admitted that she had sex with him. (Id. at 655-56). Christi testified that S.S. stated that she was going to move to Florida with Howard when she turned eighteen. (Id. at 656). Christi further testified that S.S. told her that Howard gave her the necklace, the teddy bear, and the jewelry box. (Id. at 658).

{¶33} On cross-examination, Christi testified that Howard was never alone with S.S. when he took her to school, for ice cream, or the YMCA, but that all the kids went together with Howard. (Id. at 659-60). Christi testified that she was unaware of any admission by Howard. (Id. at 663). She testified that her boyfriend and her talked about Howard and S.S. being flirtatious, but they never saw Howard do anything wrong. (Id. at 664). Christi testified that she thought her

-26-

mom was being crazy when she accused Howard, because her mom was drunk. (Id. at 666). Christi testified that S.S. told her friend how Howard liked his sandwiches made and what Howard liked to eat the night she took S.S. to the hospital. (Id. at 667). Christi testified that she had heard Jody tell Nikki that he did not want to be at the house if S.S. was not allowed to be there. (Id. at 668). Christi testified that Nikki told her that she bought S.S. the jewelry box for Valentine's Day, but Christi testified that she did not believe that. (Id. at 669). Christi testified that S.S. told her the sex hurt. (Id. at 675). On re-direct, Christi testified that she believed S.S. when S.S. stated she had sex. (Id.). Christi testified that her mom told her about hearing the bed noises from Howard's bedroom, and her mom told her that S.S. admitted she was in the bedroom (Id. at 676-77). Christi also testified that her mom told her that she had found blood in S.S.'s underwear, and that S.S. wears underwear. (Id. at 678-79).

{¶34} Kristen Blevins testified that she is a friend of Christi, and that, on July 7, 2009, Christi called her and asked her to come to the hospital. (Id. at 679-80). Blevins testified that S.S. was very upset and stated that she felt like she was going to puke. (Id. at 680). Blevins testified that she tried to get S.S. to eat a sandwich, and S.S. stated "that's how Jody likes his sandwich" or "that's what Jody eats." (Id. at 681). Blevins testified that S.S. referred to Howard several times, and that she thought S.S. loved Howard as a boyfriend, because S.S.

seemed infatuated with him. (Id. at 681-82). Blevins testified that S.S. stated that she did not want to participate in cheerleading anymore because Howard wanted her to do that, and that she thought the whole conversation was strange. (Id. at 683-84).

{¶35} Annie Gottwald testified that she is the store manager at the Marion Verizon Wireless store and was asked to testify as the custodian of the records. (Id. at 685-86). Gottwald identified State's exhibit four as copies of Verizon Wireless records for phone numbers 360-7009 and 262-3719. (Id. at 686, 689-90). Gottwald testified that State's exhibit 4A contained text messages between phone numbers 740-360-7009 and 740-262-3719 between July 6, 2009 and July 17, 2009. (Id. at 708-09).

{¶36} At this point in the trial, the video deposition of Beth Russell was played for the jury. During her deposition, Russell testified that she was the Sexual Assault Nurse Examiner (SANE Nurse) who examined S.S. (Russell Depo. at 4, 6). Russell identified State's exhibit one as a copy of the report she generated from her exam of S.S. on July 7, 2009. (Id. at 7-8). Russell testified that she conducted the exam of S.S. alone, and that during her history S.S. stated:

> **I guess this all started a couple months ago when me and my family went out to dinner. He -- meaning my sister's husband -- said that I told him he had cute dimples. He told me that I was hot. We've been in a connection since then. I can't stand being apart from him. My mom and dad found out we was having an**

> **affair. \* \* \* he put his private part into my private parts. But they didn't tell my sister. Tonight my mom had a little too much to drink and made me tell my sister everything. Let's just say he took my virginity. Yesterday was the last time we had an affair.**

(Russell Depo. at 10). Russell testified that S.S. reported the last time she had sexual relations with Howard was the morning of July 6th at 3927 Smeltzer Road. (Id. at 11). Russell testified that S.S. indicated that the sexual relations included: "[v]aginal penetration [s]he also said that he licked her private parts and her face and kissed her on her lips and her face." (Id.). Russell further testified that S.S. stated that she gave Howard oral sex and Howard gave her oral sex. (Id. at 12). S.S. indicated that Howard ejaculated on her stomach, and S.S. denied that Howard used a condom. (Id. at 13). S.S. stated that she had urinated, ate, drank, washed or wiped, brushed her teeth, taken a shower, and changed her clothes since the last sexual encounter. (Id.). Russell testified that S.S. stated that the suspect was 32 years of age and was her sister's husband. (Id. at 14). Russell testified that S.S. consented to the sexual activity, i.e. S.S. was not physically forced. (Id.). Russell testified that she did not observe any physical trauma to S.S.'s genital area, though Russell testified that this was not unusual because S.S. had a high level of estrogen. (Id. at 15). Russell testified that the hymen is more elastic when it is "estrogenized," which could explain why there was no visible trauma. (Id. at 16). Russell testified that she classified S.S's genitals as being at "Stage 5" maturity on

a 1-5 scale, meaning S.S. was at the last stage before puberty, and she was showing higher levels of estrogen and she had pubic hair. (Id. at 17). Russell testified that she did not inspect S.S.'s vagina or the cervix, because they do not perform a Foley catheter exam on girls who have not yet begun their period for fear of causing trauma or injury. (Id. at 17-18). Russell testified that S.S. stated that she did not want Howard to be mad at her for telling, and that she did not want to participate in cheerleading anymore, because he talked her into doing it and she would think about him when she was doing it. (Id. at 18). Russell further testified that S.S. stated that: she did not want to go to sleep because she did not want to stop thinking about Howard; and she hoped she would dream about Howard when she did fall asleep. (Id.).

{¶37} On cross-examination, Russell testified that she did not observe any physical injury and that she "can only tell you what she told me." (Id. at 20). Russell testified that she did not take measurements of the vaginal opening, and as far as she knew, S.S.'s hymen was intact. (Id. at 22-23). Russell testified that she combed S.S.'s pubic hair, though she did not put that in her report. (Id. at 24). Russell testified that she observed no injury to S.S.'s labia majoria, labia minora, meatus, hymen, or perineum. (Id. at 26-27). Russell testified that S.S. related that she had no bleeding. (Id. at 30). Russell identified defense exhibit one as pictures of S.S.'s face and genitals. (Id. at 31). On re-direct, Russell testified that the

pictures show that S.S.'s hymen is "estrogenized," because it was "fluffy, pale, and [] folding over itself." (Id. at 34). Russell testified that S.S. could have trauma that was not visible since they did not inspect inside her vagina using a catheter. (Id.). Russell also testified that the lack of injury does not mean that S.S. did not have sex, since vaginal fluids could be released even at her age. (Id. at 37).

{¶38} Darlene Schoonard, a SANE nurse at Marion General Hospital, identified State's exhibit twenty as a diagram of the female genitalia. (Id. at 713-14). Schoonard testified that some women do not bleed after having sex for the first time. (Id. at 717). Schoonard testified that puberty causes the hymen to become "more fluffy" and have a thicker more elastic tissue. (Id.). Schoonard testified that many times no injury is visible because of the elasticity of the hymen, the position of the sex partners, the tenseness of the partners, pelvic tilt, and lubrication. (Id. at 718). Schoonard testified that if the sex was consensual, then both partners are more relaxed and have better positioning, which leads to less injury or trauma. (Id. at 718-19). Schoonard testified that puberty begins "vassal congestion, meaning that the blood vessels in that area become engorged with blood, that transfers into the cellular system which means that the vagina itself would be more lubricated." (Id. at 719). Schoonard testified that they do not use the Foley catheter technique on girls who have not yet begun their menstrual

cycle. (Id.). Schoonard testified that they seldom see injuries in sexual assault cases. (Id. at 720).

{¶39} On cross-examination, Schoonard testified that there is no such thing as a "virgin test," even though there are some medical societies that believe in such testing. (Id. at 722). Schoonard testified that no fluids were found on the outside of S.S., but that pre-ejaculation could exist in the vagina up to seventy-two hours. (Id. at 722-23). Schoonard testified that S.S. had no visible injuries to her vaginal area. (Id. at 724, 734, 736). Schoonard testified that no speculum[1] was used since S.S. had not yet started to menstruate. (Id. at 726). Schoonard testified that no wet mount or phosphatase tests were performed to check for semen, though some hospitals do those tests, and she testified that Russell performed no test for semen other than the Wood's test. (Id. at 736-38). Schoonard testified that most of the children she sees who have been sexually assaulted are "very happy-go-lucky," and that whether sexually assaulted children act out "depends upon the relationship they have with their abuser many times." (Id. at 741-42). Schoonard testified that 99% of the time sexually assaulted children have a strong feeling of love towards the perpetrator. (Id. at 746).

{¶40} Tammy Blair testified that she contacted the prosecutor's office about the case because she saw Howard with S.S. at the YMCA in February or

---

[1] A speculum is "[a]n instrument for enlarging the opening of any canal or cavity in order to facilitate inspection of its interior." STEDMAN'S MEDICAL DICTIONARY (5 Ed. 1982) 1310.

March 2009. (Id. at 751-52). Blair testified that Howard was "pursuing [S.S.] in the pool, touching very inappropriately, just constantly on top of her in the pool." (Id. at 752). Blair testified that S.S.

> **\* \* \* would be sitting on the side of the pool and he would be in the pool, and her legs would be open and he would be in between her legs with his hands either on her -- on her sides or her hips or her thighs. He would be just an inch away from her face or whispering into her ear. They looked like a couple, but obviously I could tell that that would not be appropriate considering their age difference.**

(Id. at 753). Blair testified that she never said anything to Howard, since she did not know what to say. (Id.). She testified that her boyfriend at the time knew Howard from school, so she knew Howard was around 33 years of age, and that S.S. appeared to be teen or preteen. (Id.). Blair further testified that she found Howard's MySpace page and discovered the girl's name in an effort to contact the girl's family, but all she could locate was the girl's first name. (Id. at 753-54). Blair testified that S.S. had multiple posts on Howard's MySpace wall that said "I love you," messages for Valentine's day, and messages "that were cutesy and had hearts and things on 'em[;] [t]he kind of messages that a 12 year old shouldn't be sending to a 33 year old man." (Id. at 754).

{¶41} On cross-examination, Blair testified that she did not report Howard's actions to the YMCA lifeguard on duty, and that she did not talk to anyone about Howard's actions except her sister and boyfriend. (Id. at 755-57).

Blair testified that she never contacted the prosecutor's office until July after she read about the charges against Howard in the newspaper. (Id. at 758-60). Blair testified that she never saw any sexual touching between Howard and S.S. (Id. at 760). Blair further testified that she feels guilty she never said anything to anyone earlier about what she witnessed. (Id. at 766).

{¶42} Lorri Ross testified that she was S.S.'s sixth grade teacher, and that S.S. told her that her boyfriend gave her a teddy bear for Valentine's Day. (Id. at 767-69). Ross testified that S.S. did not tell her who her boyfriend was, but S.S. would mention the name Jody quite often. (Id. at 769). Ross testified that S.S. would talk about Jody as her brother-in-law, and how her brother-in-law was picking her up from cheerleading practice and taking her to school. (Id.). Ross testified that S.S. asked her if she wanted to listen to a rap CD that Howard made, but she declined. (Id.). On cross-examination, Ross testified that S.S. is a very good student, very bubbly and laughs all the time. (Id. at 770). Ross testified that she never saw any evidence of problems in S.S.'s home, and that S.S. never appeared to be suffering from any type of anxiety. (Id. at 771). Ross testified that she was surprised to find out that S.S. may have been sexually abused based upon the way S.S. acted at school. (Id.). Ross testified that S.S. never stated that Howard was her boyfriend, and S.S. never told her about a Valentine's gift box with the teddy bear in it. (Id. at 771-72).

**{¶43}** Deputy Amy McDonald testified that she spoke with S.S. on July 8, 2009, and that S.S. told her that she had sex with Howard. (Id. at 776-80). According to McDonald, S.S. indicated she was not sure how many times they had sex, but it was more than twice, the last time being the Monday prior to the interview when she was in Howard's bedroom. (Id. at 780). Deputy McDonald testified that S.S. stated that Howard kissed her, touched her, and penetrated her with his finger while she was in the front of the vehicle and the younger children were in the back of the vehicle. (Id. at 782). S.S. stated that Howard would make a gun with his hand and act like he was shooting towards her when he wanted to digitally penetrate her. (Id.). Deputy McDonald testified that S.S. stated that Howard was her boyfriend, and that he was the only person she could talk to, and the only person that cared for her. (Id. at 783). S.S. stated that she missed Howard and wanted to know when she could see him again. (Id.). Deputy McDonald further testified that S.S. indicated that her relationship with Howard began around Christmastime, and that they had sex in the bedroom and in the downstairs laundry room. (Id. at 786).

**{¶44}** On cross-examination, Deputy McDonald testified that S.S. stated that she told her friend, Brianna Burge, about her relationship with Howard, but Deputy McDonald never interviewed Burge, and the sheriff's department interviewed Burge on June 28, 2010, almost a year after the interview with S.S.

(Id. at 790). Deputy McDonald acknowledged that her report indicated that S.S. told her "my mom and dad knew and they told me that as long as I didn't do it anymore they wouldn't tell my sister." (Id. at 795). Deputy McDonald testified that S.S. appeared to be infatuated with Howard. (Id. at 800).

{¶45} Gwen Chestnut, the Marion County Prosecutor's Office Victim Advocate, testified that, on July 15, 2009, the prosecutor and she interviewed S.S. at their office. (Id. at 812-13). Chestnut testified that, when S.S. was asked if she knew why she was there, S.S. indicated "because I'm having an affair with my brother-in-law." (Id. at 814-15). S.S. indicated that Howard began touching her around Christmas 2008, which started with simple touching, then moved to vaginal touching, and eventually to intercourse. (Id. at 815). Chestnut testified that S.S. stated that Howard put his penis into her mouth, and he asked her to give him "head," but she was not sure what to do, so Howard moved her mouth back and forth. (Id. at 816). Chestnut testified that S.S. indicated that Howard inserted his finger into her vagina multiple times in his home, in his bed, in the laundry room, and in the vehicle when he would bring her home from school with the other kids in the car. (Id.). S.S. called this "finger banging." (Id.). When Chestnut asked whether Howard would ejaculate in her vagina, S.S. was not familiar with the term "ejaculate," but referred to it as "cum," and S.S. stated that Howard would not "cum" into her vagina but on her stomach, her face, or in her mouth.

(Id. at 817). When Chestnut asked S.S. about how she felt about Howard, S.S. stated that "she cared about him a lot, she loved him. He was her boyfriend. And when she was 18 he was going to leave his wife, Nikki, and they were gonna go to Florida and get married." (Id.). Chestnut further testified that S.S. indicated that Howard gave her a teddy bear, a necklace, and a jewelry box, and S.S. would not turn over the necklace because she was wearing it. (Id. at 818-19). Chestnut testified that S.S. provided her with her MySpace user ID and password. (Id. at 819). Chestnut testified that she found a tremendous amount of IM messages from Howard, but she could not see the content of those messages because they were mostly deleted. (Id.). Chestnut identified State's exhibit twenty-one as a copy of S.S.'s MySpace page, which featured S.S.'s profile picture: Howard behind S.S. holding her in a headlock. (Id. at 820). Chestnut testified that in a four-month period, Howard instant messaged S.S. four hundred and twelve (412) times, including: five (5) times in November; one hundred twenty-five (125) times in December; twenty-six (26) times in January; one hundred forty-three (143) times in February; seventy-five (75) times in March; and eighteen (18) times in April. (Id. at 821-22).

{¶46} Chestnut further testified that she listened to the July 8-9, 2009 phone calls that Howard placed from jail. (Id. at 822). Chestnut identified: State's exhibit twenty-two as Howard's July 8, 2009 phone call to his mother, Wanda

-37-

Howard; State's exhibit twenty-three as Howard's fourth telephone call; State's exhibit twenty-four as Howard's fifth phone call on July 8, 2009; State's exhibit twenty-five as Howard's sixth phone call on July 8, 2009; and State's exhibit twenty-six as Howard's seventh phone call from July 8, 2009. (Id. at 825-29). On cross-examination, Chestnut testified that S.S. never denied that these things happened. (Id. at 838). Chestnut testified that she was not surprised that Howard's MySpace contacts with S.S. drop off after April, because that was outside the "grooming period." (Id. at 845). Chestnut testified that S.S. has never gone to counseling. (Id. at 848).

{¶47} Marion County Sheriff's Office Detective Ryan Scheiderer testified that he was asked to review a phone call that Howard made to Nikki from jail around 1:53 p.m. (Id. at 885-87). Detective Scheiderer testified that, during the phone call, Howard can be heard asking Nikki where his wallet was, and Nikki advised Howard that his mother had the wallet. (Id. at 886). Detective Scheiderer testified that he then listened to Howard's second phone call to Nikki, placed at 2:02 p.m. that same day, in which Howard asks Nikki if she found the wallet. (Id. at 887). During the call, Nikki tells Howard that she found the wallet, and Howard asks Nikki to look inside the wallet, according to Detective Scheiderer. (Id.). Nikki then advises Howard that she found something, and then Nikki is heard crying on the phone, asking Howard "what is it? What's this about?" (Id.).

Howard apologizes to Nikki, asks her not to watch it and to get rid of it, according to Detective Scheiderer. (Id.). Detective Scheiderer testified that he listened to the phone calls around 3:00 to 3:15 p.m., and then, contacted Detective Brown and advised him that they needed to locate Nikki Howard and discover the contents of Howard's wallet. (Id. at 889).

{¶48} Detective Scheiderer located Nikki at Howard's parents' home, and he told Nikki he was aware that Howard had something in his wallet, and he asked Nikki to turn it over to him. (Id. at 890). Detective Scheiderer testified that Howard's family became very disruptive, so Nikki asked to speak with them in the cruiser. (Id. at 890-91). At that point, Nikki produced the wallet but denied finding anything inside except some medical or insurance cards, so he informed Nikki that she could get charged with tampering with evidence, which is a felony offense. (Id. at 891-92). Detective Scheiderer testified that Nikki told them she had found a memory card with S.S. on it. (Id. at 892). When they asked for Nikki to turn over the memory card, Nikki advised them that it was in the residence. (Id.). They then went back to the residence, and Nikki retrieved the memory card, but declined to turn it over to them, according to Detective Scheiderer. (Id. at 893). Detective Scheiderer testified that he then told Nikki he would obtain a search warrant, and, at that point, Nikki turned over the memory card. (Id. at 894). Detective Scheiderer testified that Nikki advised that the memory card had a video

of S.S. wearing a towel on her head naked from the neck down dancing around in front of the camera. (Id. at 895). He further testified that Nikki attempted to play the video from Howard's phone, but an error message appeared on the phone. (Id. at 895-96). Detective Scheiderer testified that they were never able to retrieve the information from the memory card. (Id. at 896).

{¶49} Detective Scheiderer testified that subsequently they executed a search warrant at Howard's 3927 Smeltzer Road residence to search for additional storage devices, media devices, computers, and miscellaneous memory storage devices. (Id. at 897-98). Detective Scheiderer identified several of the items seized from the home, including: State's exhibit twenty-eight as Howard's cell phone; State's exhibit twenty-nine as a two-gigabyte jump drive; State's exhibit thirty as a travel disc; State's exhibit thirty-one as the circuit board of the desk top computer; State's exhibit thirty-two as the SD card removed from the printer; State's exhibit thirty-three as miscellaneous CDs and DVDs; State's exhibit thirty-four as an Acer laptop from Howard's desk; State's exhibit thirty-five as Nikki's desktop computer; and State's exhibit thirty-six as a Dell desktop computer taken from Howard's desk. (Id. at 898-901).

{¶50} Marion County Sheriff's Office Major Jeff Cline testified that he received a phone call on July 8th from Major Corwin who requested that he go to 512 Mary Street for the execution of a search warrant. (Id. at 927-28). Major

Cline testified that the detectives were at this residence trying to obtain a media card from a cell phone. (Id. at 929). Major Cline testified that Nikki retrieved a couple cell phones from the house, brought them outside, and handed Detective Scheiderer a media card from a cell phone. (Id. at 929-30). When he asked Nikki if it was the media card from Howard's cell phone, Nikki stated "yes," but Nikki was unable to get the media card to work. (Id. at 930). Major Cline testified that he asked Nikki what was on the card, because she had previously stated she had seen it, and Nikki stated that there was a video of S.S. fresh out of the shower with a towel on her head naked dancing and laughing. (Id.). On cross-examination, Major Cline testified that he was not sure which phone Nikki placed the media card into to play the video. (Id. at 936). He further testified that he could not recall whether the phone displayed an error message since he was not the officer trying to open the video. (Id. at 937-38).

{¶51} Marion County Sheriff's Office Deputy Brian Brown testified that Nikki stated that the media card contained a video of S.S. naked with a towel wrapped around her head dancing around. (Id. at 943). Deputy Brown identified: State's exhibit twenty-seven as the media card taken from Nikki; State's exhibit twenty-eight as Howard's cell phone; and State's exhibit twenty-eight-A as another media card collected at Howard's parents' residence. (Id. at 944-45). Deputy Brown further testified that Detective Scheiderer and he executed the

search warrant of Howard's residence. (Id. at 945). He testified that they seized computers from the residence, and that he took those computers to BCI personally. (Id. at 946-47). Deputy Brown testified that he collected DNA from Howard, which was submitted with the rape kit. (Id. at 948). He testified that Step Number 10 of the rape kit is the pubic hair combing, but that no pubic combing was done in this case because the patient (S.S.) shaved her pubic hair. (Id.).

{¶52} Erica Moore, a computer forensic specialist for BCI & I, identified State's exhibit thirty-nine as the report of her analysis of three computer hard drives. (Id. at 971, 974-75). Moore testified that she created forensic images of the hard disc drives to retrieve the data on those hard discs, which she then downloaded onto a DVD disc she identified as State's exhibit forty. (Id. at 977-78). Moore identified State's exhibit twenty-seven as BCI Item No. 1 and the two gigabyte secure digital (SD) card from Howard's wallet. (Id. at 978-79). Moore testified that she was unable to examine the SD card, because it "might have been damaged in some way" by "maybe running it under water, [or] maybe using a magnet," though Moore could not say for sure. (Id. at 980-81). Moore identified: State's exhibit twenty-nine, BCI Item No. 2, and a two-gigabyte Universal Serial Bus (USB) Drive from which she created Attachment A to State's exhibit forty, which contained 40 movies and 19 pictures she thought depicted S.S. based upon S.S.'s MySpace profile picture. S.S. was not naked in any of these movies or

pictures, however. (Id. at 981, 985-86). Moore identified State's exhibit thirty, BCI Item No. 3, and a one-gigabyte USB drive on which she found nothing. (Id. at 982, 986). Moore identified State's exhibit twenty-eight, BCI Item No. 4, as a mobile phone from which she created Attachment B to exhibit forty, which contained text messages, audio files, graphic images, a calendar, and a phone book file. (Id. at 982, 986). Moore identified State's exhibit twenty-eight A as the SD card from the mobile phone (State's exhibit twenty-eight) from which she created Attachment C to exhibit forty, which contained 41 pictures she thought might be S.S. (Id.). Moore identified State's exhibit thirty-two, BCI Item No. 6, as a two-gigabyte SD card from which she created Attachment D to State's exhibit forty, which contained 2 movies and 12 pictures she thought depicted S.S. (Id. at 983, 986-87).

{¶53} Moore identified State's exhibit thirty-four, BCI Item No. 8, as the laptop computer, which had two user accounts, one for "Jody" and one for "JDH." (Id. 984, 987-88). Moore testified that the JDH user account was configured for a password, but the user could login by just hitting the enter key without actually providing a password. (Id. at 988-89). The Jody user account, however, required an actual password. (Id. at 989). Moore testified that she identified multiple references to child pornography related to the JDH user account, which she compiled in Attachment F of State's exhibit forty. (Id. at 989-94). Moore testified

that she identified multiple references to child pornography related to the JDH user account in a FrostWire peer-to-peer file sharing program, which she compiled in Attachment G of State's exhibit forty. (Id. at 995-96). Moore testified that she located 1,050 images of child pornography on the hard disc's unallocated space and in the temporary internet files related to the Jody user account, which she compiled in Attachment I of State's exhibit forty. (Id. at 996-97). Moore testified that she located 1,050 thumbnail images that were associated with the images of child pornography in Attachment I, which she compiled in Attachment J of State's exhibit forty. (Id. at 997-98). Moore testified that she found 320 photographs that she thought depicted S.S., which she included on Attachment K of State's exhibit forty. (Id. at 998-99). Moore testified that she also found text references to S.S. on the laptop, which she compiled in Attachment L of State's exhibit forty. (Id. at 999). Moore testified that she found references to internet searches for preteen nude models on the laptop, which she compiled in Attachment M of State's exhibit forty. (Id. at 999-1000).

{¶54} Moore testified that the desktop computer tower, State's exhibit thirty-six, BCI Item No. 10, was a computer tower that had two user accounts, including "Jody" and "log." (Id. at 1006). The Jody user account was password protected. (Id. at 1009). Moore identified Attachment U of State's exhibit forty as the results of her search for text terms frequently associated with child

pornography, which netted multiple references. (Id. at 1007). Moore identified Attachment V of State's exhibit forty as her search results for text terms frequently associated with child pornography related to the peer-to-peer file sharing applications LimeWire and FrostWire on the computer. (Id. at 1009-10). Moore testified that she found "a lot of text that [she's] seen in the past to reference child pornography," including the following: "baby girl, "self made," "viv," "15 year old," "Documentsandsettings\Jody\desktop\incomplete\12yearold\underage\child\ daughter\child\sex\child\lover," "Amy 14 year old," "Sandra," "Lolita preteen model child sex lover ptsc pthc." (Id.). Moore identified Attachment W to State's exhibit forty as a "movie film which [she] thought depicted child pornography." (Id.). Moore identified Attachment X to State's exhibit forty as "942 graphic images that may depict child pornography," which she found within the computer's unallocated space, the C Drive, and Google Chrome search files on the Jody user account. (Id. at 1010-12). Moore identified Attachment Y to State's exhibit forty as 19 pictures she found on the computer that could be S.S. (Id. at 1012). Moore identified Attachment Z as "searches for 12 year old nude preteen porn streaming, preteen non nude models, sucking dick webcam girl and young girl models sexy lolitas." (Id. at 1012). When Moore was asked whether the pornographic images on Attachments I and X were downloaded, she answered:

> **Some of them are different, for -- sorry, let me find Attachment I on here. For Attachment I there were some located within unallocated space and with those you can't tell where they came from, you can just tell that they're there. On the other ones that were located within Temporary Internet Files, "content.ie5", like that leads me to believe that they were looked at using Internet Explorer. So it was just a website, you know, access websites.**

(Id. at 1014-15). The prosecutor then asked if the images that were viewed online could have been downloaded, and Moore responded, "absolutely." (Id. at 1015). Finally, Moore identified State's exhibit forty-one as a list of the file names of pictures thought to be child pornography. (Id.).

{¶55} On cross-examination, Moore testified that the pictures she found on the unallocated space of the computer's hard disc were not saved, but she could not testify whether those pictures had been deleted or not. (Id. at 1017-18). She further testified that the Jody user account on BCI Item No. 10 (State's exhibit 36, the desktop computer) was not password protected, but the Jody account on BCI Item No. 8 (State's exhibit 34, the Acer laptop) was password protected. (Id. at 1018-19). Some of the 1,050 pictures she found were on the Jody user account and some on the JDH user account, which was not password protected. (Id. at 1022). Moore testified that the pictures on Attachment I were from the laptop (BCI Item No. 8), while the pictures on Attachment X were from the desktop (BCI Item No 10). Moore testified that, out of all the pictures obtained, only one picture was found on an account that required a password. (Id. at 1024). Moore testified

that the pornographic images could have been deleted by computers' previous owners, if any. (Id. at 1030). Moore testified that she could not attribute files located in unallocated space to any user names. (Id. at 1031). Moore testified that nineteen counts in the indictment corresponded with pornographic pictures taken from Attachment I, (pictures extracted from the laptop computer), including: sixteen counts attributable to pictures found on the JDH user account; one count attributable to a picture found on the Jody user account; and two counts attributable to pictures found in unallocated space. (Id. at 1032-33). Moore testified that the forty-eight counts of child pornography are related to the pornographic pictures found on BCI Item Nos. 8 and 10 (the Acer laptop and Dell desktop). (Id. at 1039). Moore testified that the pornographic pictures associated with forty-seven of the forty-eight counts were from user accounts with no passwords, meaning anyone who had access to the computer could have viewed the pictures online. (Id. at 1049-50, 1064-65). Moore testified that she found no evidence that: any of the pictures were loaded onto a CD, floppy disc, flash drive; the pictures were enlarged; or the pictures were printed. (Id. at 1060-61). Moore testified that there was no evidence that the SD card had been wet, magnetized, or cut up. (Id. at 1068-69).

{¶56} On re-direct, Moore testified that every functional user account on both the laptop and desktop computers (BCI Item Nos. 8 and 10) were under Jody

or JDH. (Id. at 1071). Moore testified that the amount of images found on the machines was more than normal for random internet pop-ups or spam email. (Id.). Moore testified that if the video on the SD card had been simply deleted, then she should have been able to open it. (Id. at 1072).

{¶57} Bob Peterson, an investigator in the prosecutor's office, testified that he examined Attachments I and X of State's exhibit forty and downloaded the worst images; namely, those where children were involved in sexual acts or pictures focusing on the child's genitals. (Id. at 1075-77). Peterson identified State's exhibit forty-one as a list of the pornographic pictures, with pictures he picked out being marked with a brief description of the picture listed on the exhibit. (Id. at 1077). Peterson identified State's exhibit numbers fifty-two to seventy-six as the pictures he downloaded and printed off from Attachments I and X of State's exhibit forty. (Id. at 1078-79). Peterson then described the contents of each picture in relation to the Counts in the indictment. (Id. at 1079-89). Peterson testified that Attachments I and X contained 1,992 images. (Id. at 1089). Peterson further testified that he was provided with one CD, which he identified as State's exhibit five, containing all thirteen of Howard's phone calls from jail. (Id. at 1090). Peterson made several CDs containing the individual phone calls, which he identified as State's exhibits twenty-three to twenty-six. (Id. at 1091-92).

{¶58} Thereafter, Howard made a Crim.R. 29(A) motion and a motion for a mistrial, which were both overruled. (Id. at 1123-29). The State then rested, and the defense presented testimony from two witnesses. (Id. at 1130).

{¶59} Deputy Thomas Miller testified that S.S. never told her mom or dad or sister, Christi, about having sex with Howard. (Id. at 1131). Deputy Miller testified that he never learned about S.S.'s parents promising not to tell Nikki about the incident if S.S. promised not to do it anymore. (Id. at 1132). On cross-examination, Deputy Miller testified that S.S. was uncomfortable speaking with him in the presence of her father. (Id.).

{¶60} John Deraedt, owner of a software integration company, testified that temporary internet files are automatically created by the computer when the user is downloading or browsing. (Id. at 1134-35, 1145-46). Deraedt testified that he reviewed Attachments A through Z of State's exhibit forty, and the only things relative to the criminal charges were found on Attachments I and X. (Id. at 1153-54). Deraedt testified that many of the 1,992 images were duplicate images, which indicated to him that they could have been created by visiting the same website several times or from several pop-ups from the same website. (Id. at 1156). Deraedt testified that the pictures that were extracted were "low grade, cropped images," not "photo quality stuff * * * like you would typically find on any web page when you'd click on it and it brings 'em up." (Id. at 1157). Deraedt testified

that none of the pictures were actually downloaded onto the computers, but were "leftover junk essentially from surfing" the internet. (Id. at 1158). Deraedt testified that there was no way to tell if the computer user enlarged the pictures or not. (Id. at 1165-66). On cross-examination, Daraedt testified that he did not have a degree in computer forensics, and that the BCI report was correct. (Id. at 1175-76). He testified that no one can say for sure whether the images were downloaded, but that they were located in areas that typically would not be indicative of a download. (Id. at 1184).

{¶61} In his second and fourth assignments of error, Howard argues that the State presented insufficient evidence to support his convictions for pandering obscenity involving a minor (Count 51) and illegal use of a minor in a nudity-oriented material or performance (Count 77). Specifically, Howard argues that Nikki's out of court statements were the only evidence to support these convictions. We disagree.

{¶62} Counts 51 and 77 stem from Howard's cell phone video of S.S. The criminal offense of pandering obscenity involving a minor is codified in R.C. 2907.321(A)(1) and provides: "[n]o person, with knowledge of the character of the material or performance involved, shall * * * [c]reate, reproduce, or publish any obscene material that has a minor as one of its participants or portrayed observers[.]" The criminal offense of illegal use of a minor in a nudity-oriented

-50-

material or performance is codified in R.C. 2907.323(A)(1) and provides, in pertinent part: "[n]o person shall * * * create, direct, produce, or transfer any material or performance that shows [a] minor [,not the person's child or ward,] in a state of nudity[.]"

{¶63} The evidence that supported Howard's conviction for Count 51 included more than Nikki's statement concerning the contents of the cell phone video. The jury also listened to Howard's phone call from jail wherein Howard asked Nikki to get rid of his cell phone's SD card that was in his wallet. (State's Ex. 25). During the phone call, Howard asks if Nikki found what he was talking about in his wallet, and she says "yes." (Id.). Nikki then asks, "whose is this?" and Howard admits it is his. (Id.). Nikki then asks "what am I supposed to do" and begins crying. (Id.). Howard indicates that he never had intercourse with "her," and Nikki sobbingly asks Howard "why did you do this, why?" (Id.). Howard then asks Nikki "are you still with me," and Howard then instructs Nikki to "get rid of it, now." (Id.). Nikki replies that she's looking at it now; Howard tells Nikki "please don't, please, please, please" several times; and Nikki states that she has to watch the whole thing. (Id.). In the background, a young girl is heard giggling and laughing on what sounds like a video clip. (Id.). After viewing the item, Nikki states, "I just don't understand," and Howard promises he will "make it better" when he gets out of jail, and there will be no more secrets

between them. (Id.). Aside from this evidence, the jury heard evidence of S.S.'s prior Grand Jury testimony that Howard made a cell phone video of her in the shower. (June 28-30 and July 1-2, 2010 Tr. at 581). Viewing this evidence in a light most favorable to the prosecution, a reasonable jury could conclude that Howard violated R.C. 2907.321(A)(1) and R.C. 2907.323(A)(1).

{¶64} Howard's second and fourth assignments of error are, therefore, overruled.

{¶65} In his third and fifth assignments of error, Howard argues that the State presented insufficient evidence to support his convictions for pandering obscenity involving a minor (Counts 52 to 76) and illegal use of a minor in a nudity-oriented material or performance (Counts 78-102).

{¶66} Counts 52-76 and 78-102 stem from the child pornography found on Howard's computer hard drives. Counts 52-76 charged Howard with violations of R.C. 2907.321(A)(5), which provides: "[n]o person, with knowledge of the character of the material or performance involved, shall * * * [b]uy, procure, possess, or control any obscene material, that has a minor as one of its participants[.]" As used in R.C. 2907.321, "material" is broadly defined and "includes an image or text appearing on a computer monitor * * * or an image or text recorded on a computer hard disk[.]" R.C. § 2907.01(J). Counts 78-102 charged Howard with violations of R.C. 2907.323(A)(3), which provides: "[n]o

person shall * * * [p]ossess or view any material or performance that shows a minor who is not the person's child or ward in a state of nudity[.]"

**{¶67}** Howard's arguments that he never downloaded or printed the obscene material lack merit since "material" includes images appearing on a computer monitor or images recorded on the computer's hard disk, where the images were found in this case. The testimony at trial demonstrated that the images had to have been viewed on the computer screen for those images to be recorded on the computer's hard disks. The evidence demonstrated that Howard had over one thousand images of child pornography, multiple text references to terms indicative of child pornography, and texts indicative of Google searches for child pornography on the hard disks of computers that has user name accounts for "JDH" and "Jody"—Howard's initials and first name, respectively. These computers had no other user accounts on them, and Howard's wife, Nikki, had accounts on different computers where no child pornography was found. This evidence, taken with the evidence of Howard's cell phone video of S.S. and the evidence of sexual conduct with S.S., could lead a reasonable juror to conclude that Howard was responsible for procuring and possessing the child pornography on the computer hard disks. Furthermore, a reasonable juror could conclude that Howard procured the child pornography with knowledge of the character of the material from the amount of images found. A rational juror could also conclude

that the images on Howard's computers were not the result of spam email and random internet pop-ups in light of their quantity. Viewing the evidence presented in a light most favorable to the prosecution, a reasonable juror could have concluded that Howard violated R.C. 2907.321(A)(5) and R.C. 2907.323(A)(3).

{¶68} Howard's third and fifth assignments of error are, therefore, overruled.

{¶69} In his sixth and seventh assignments of error, Howard argues that his convictions for rape (Counts 1-3) and gross sexual imposition (Counts 41-43) are against the manifest weight of the evidence. Specifically, Howard argues that the jury lost its way by believing S.S.'s statements made prior to trial rather than her testimony in court under oath. We disagree.

{¶70} The criminal offense of rape is codified in R.C. 2907.02, which provides, in pertinent part: "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." R.C. 2907.02(A)(1)(b). The criminal offense of gross sexual imposition is codified in R.C. 2907.05 and provides, in pertinent part: "[n]o person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when * * * [t]he other

-54-

person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person." R.C. 2907.05(A)(4).

{¶71} Howard argues that S.S.'s statements made to law enforcement prior to trial are not trustworthy. As an initial matter, we note that even under a manifest weight analysis, we must allow the trier of fact appropriate discretion on credibility of the witnesses. *DeHass*, 10 Ohio St.2d at 231. S.S. stated to law enforcement that Howard and she had sex more than once but probably not more than three times. S.S. also stated to law enforcement that Howard performed oral sex upon her, and she performed oral sex upon Howard. S.S. further stated to law enforcement that Howard inserted his finger into her vagina, kissed her lips and breasts, and fondled her private parts. S.S. made consistent, detailed statements, including the locations, the signals, and persons present, to several members of law enforcement and testified to these aforementioned acts under oath before the Grand Jury. Although S.S. testified at trial that she lied about the incidents, there was testimony indicating that S.S. loved Howard and that S.S. stated she wished she never said anything about what happened. During her interview with Deputy McDonald, S.S. asked several times when she could she Howard again. S.S. also stated to several individuals before trial, including her sister, Christi, law enforcement, and her teacher, that the jewelry box, the teddy bear, and necklace were Valentine's Day gifts from Howard. Although S.S. testified at trial that the

gifts were from Nikki and Howard jointly, the jewelry box contained notes indicative that it came from Howard only. Furthermore, S.S. refused to turn over the necklace to authorities, which tends to corroborate Christi's testimony that S.S. adored her necklace because it was from Howard.

{¶72} Since S.S. consistently and repeatedly made detailed statements of her sexual relationship with Howard before trial, S.S.'s testimony at trial was impeached by these prior statements. Aside from that, S.S stated that she could not recall, did not know, or "kinda sorta" for her answer to many of the prosecution's questions. In addition to that, the jury was made aware of the family's possible attempts to cover-up what happened. This included Howard's father-in-law's testimony at trial denying his suspicions of Howard, and believing his daughter's changed story. This also included evidence that Howard's wife, Nikki, helped destroy evidence in the case and accused her own father of molesting S.S. All of this, along with S.S.'s stated love for Howard, could lead the jury to question S.S.'s credibility and trustworthiness at trial.

{¶73} Regardless of S.S.'s prior statements, the jury had other circumstantial evidence of Howard's guilt. "Circumstantial evidence and direct evidence inherently possess the same probative value." *State v. Treesh* (2001), 90 Ohio St.3d 460, 485, 739 N.E.2d 749, citing *Jenks*, 61 Ohio St.3d 259, at paragraph one of the syllabus. The evidence demonstrated that Howard became

irate and suicidal in direct response to S.S.'s admission to Nikki that she had sex with Howard. Howard, in fact, admitted that "something" happened but would not give details. Howard's actions in the aftermath of S.S.'s admission are indicative of Howard's guilt—why would he have such a strong reaction if S.S.'s admission were false? The jury also heard evidence from family members, Christi and Bret, that Howard flirted with S.S., and the jury heard evidence from an independent witness, Tammy Blair, that Howard and S.S. interacted like a boyfriend and girlfriend at the YMCA pool. The jury also heard evidence regarding Howard's hundreds of MySpace contacts with S.S., including chats where Howard indicates how much he misses S.S. and asks S.S. to delete his MySpace messages because Nikki is getting suspicious. The jury had evidence of Howard's possession of child pornography, including a video of S.S. dancing naked on his cell phone. Many of the children depicted in the pornography were performing sexual acts similar to the ones that S.S. stated were performed between Howard and her. The jury also heard evidence from which it could have concluded that S.S. was in Howard's bedroom having sex, as S.S.'s mother, Jane, concluded. Although no physical evidence was found on S.S. indicative of sexual activity, Jane testified that she found blood on S.S.'s underwear one time, even though S.S. had not yet started her period. While none of these pieces of evidence individually may have been enough to convict Howard, taken together, along with S.S.'s multiple,

consistent statements implicating Howard, the evidence as a whole weighs in favor of Howard's guilt.  Therefore, we cannot conclude that Howard's rape and gross sexual imposition convictions are against the weight of the evidence.

{¶74} Howard's sixth and seventh assignments of error are, therefore, overruled.

{¶75} In his eighth assignment of error, Howard argues that the State provided insufficient evidence to support his complicity to tampering with evidence conviction.  Specifically, Howard argues that the State failed to produce evidence that the SD card was altered or destroyed with the purpose of impairing its value or availability as evidence.

{¶76} The offense of tampering with evidence is codified in R.C. 2921.12 and provides, in pertinent part: "[n]o person, knowing that an official proceeding or investigation is in progress * * * shall * * * [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]"  R.C. 2921.12(A)(1).  R.C. 2923.03(A)(4) provides: "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [c]ause an innocent or irresponsible person to commit the offense."  "A person acts purposely when it is his specific intention to cause a certain result * * *."  R.C. § 2901.22(A).  "[I]ntent, lying as it does within the privacy of a person's own thoughts, is not susceptible of objective

proof [; and therefore,] intent can be determined from the surrounding facts and circumstances, and persons are presumed to have intended the natural, reasonable and probable consequences of their voluntary acts." *State v. Garner* (1995), 74 Ohio St.3d 49, 60, 656 N.E.2d 623.

{¶77} The complicity to tampering with evidence charge stems from Howard's phone conversation with Nikki from jail wherein he asks Nikki to "get rid of" his SD card, which contained a video of S.S. dancing naked on it. As we mentioned earlier, what appears to be the contents of the video was heard in the background of the phone conversation between Nikki and Howard. The testimony at trial demonstrated that law enforcement arrived at Howard's parents' home to retrieve the SD card from Nikki less than two hours after the phone conversation when the SD card was playing the video. Although Nikki refused to provide law enforcement with the SD card at first, eventually Nikki went inside the home, without the accompaniment of a law enforcement officer, and retrieved the SD card. When Nikki presented the SD card for the officer to play the video, the phone displayed an error message. Nikki stated that she did not erase or destroy the SD card; however, the BCI & I lab was unable to open the SD card, which Moore testified was unusual absent tampering. The jury was also aware of the fact that Nikki was being very supportive of her husband, even after seeing the video of S.S. dancing naked, to the point of disowning her own family and implicating

her own father in the crime. Viewing this evidence in a light most favorable to the prosecution, a rational trier of fact could conclude that Howard solicited Nikki to alter or destroy the SD card with the purpose of impairing its value or availability as evidence against her husband.

{¶78} Howard's eighth assignment of error is, therefore, overruled.

### ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY DENYING HIS MOTION TO SEVER THE COUNTS.**

{¶79} In his first assignment of error, Howard argues that the trial court erred by denying his motion to sever Counts 51-103 of the supplemental indictment from Counts 1-50 of the original indictment for purposes of trial. Howard argues that the joinder of these Counts was improper because: it was prejudicial; evidence of each crime was not simple and direct; and the State would not have been able to introduce evidence of the joined offenses as "other acts" evidence under Evid.R. 404(B). We disagree.

{¶80} Crim.R. 8(A) permits the joinder of multiple charges against a defendant if the charges "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Moreover, "it is well settled that the law favors joinder."

-60-

*State v. Waddy* (1992), 63 Ohio St.3d 424, 429, 588 N.E.2d 819, superseded by constitutional amendment as stated in *Smith*, 80 Ohio St.3d 89.  See, also, *State v. Voorhis*, 3d Dist. No. 8-07-23, 2008-Ohio-3224, ¶63.

{¶81} When a defendant claims that he was prejudiced by the joinder of multiple offenses, a court must determine: (1) whether evidence of the other crimes would be admissible even if the counts were severed; and (2) if not, whether the evidence of each crime is simple and distinct.  *State v. Schaim*, (1992) 65 Ohio St.3d 51, 59, 600 N.E.2d 661, citing *State v. Hamblin* (1988), 37 Ohio St.3d 153, 158-59, 524 N.E.2d 476.  Moreover, "[i]f the evidence of other crimes would be admissible at separate trials, any 'prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that possible in separate trials,' and a court need not inquire further." *Schaim*, 65 Ohio St.3d at 59, quoting *Drew v. United States* (C.A.D.C., 1964), 331 F.2d 85, 90.  See also *Voorhis*, 2008-Ohio-3224, at ¶66.

{¶82} To prevail on a claim that the trial court erred in denying a motion to sever, the defendant generally has the burden of affirmatively demonstrating:

**(1)   that his rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial.**

*Schaim*, 65 Ohio St.3d at 59, citing *State v. Torres* (1981), 66 Ohio St.2d 340, 421 N.E.2d 1288, syllabus. However, a defendant's failure to renew his or her Crim.R. 14 motion for severance at the close of the State's case or at the close of all evidence waives all but plain error on appeal. *State v. Miller* (1995), 105 Ohio App.3d 679, 691, 664 N.E.2d 1309, citations omitted.

{¶83} To demonstrate plain error, the defendant must demonstrate that the trial court deviated from a legal rule, the error was an obvious defect in the proceeding, and the error affected a substantial right. *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240. The defendant must also demonstrate that the outcome of his trial would clearly have been different but for the trial court's errors. *State v. Waddell* (1996), 75 Ohio St.3d 163, 166, 661 N.E.2d 1043, citing *State v. Moreland* (1990), 50 Ohio St.3d 58, 552 N.E.2d 894. We recognize plain error "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Landrum* (1990), 53 Ohio St.3d 107, 110, 559 N.E.2d 710, quoting *State v. Long* (1978) 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph three of the syllabus.

{¶84} Howard failed to renew his Crim.R. 14 motion for severance at the close of the State's case or at the close of all evidence, and therefore, Howard has waived all but plain error on appeal. (June 28-30 and July 1-2, 2010 Tr. at 1123-30, 1191). Howard has failed to demonstrate plain error. To begin with, Howard

has failed to demonstrate that the trial court deviated from a legal rule. In a similar case, this Court found that child pornography depicting images similar to the defendant's alleged conduct with the victim were admissible to show defendant's motive, intent, scheme, or plan under Evid.R. 404(B); and therefore, joinder of the child pornography and rape charges was permissible. *Voorhis*, 2008-Ohio-3224, at ¶73, citing *State v. Eichorn*, 5th Dist. No. 02 CA 953, 2003-Ohio-3415, ¶¶33-34. Similar to the facts in *Voorhis*, the record demonstrates that Howard was alleged to engage in conduct similar to that depicted in the child pornography on his computer hard disks. Notably, the images were of girls of similar ages to S.S. performing and receiving oral sex, and having intercourse with adult men. (State's Exs. 52-76); (June 23-30 and July 1-2, 2010 Tr. at 1079-89). Additionally, Howard has failed to demonstrate that, but for the trial court's denial of his Crim.R. 14 motion, the result of the trial would have *clearly* been different. Therefore, Howard has failed to demonstrate plain error necessary to sustain his first assignment of error.

{¶85} Howard's first assignment of error is, therefore, overruled.

## ASSIGNMENT OF ERROR NO. IX

**THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT AND VIOLATED HIS RIGHT TO CONFRONTATION UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND SECTION 10, ARTICLE I OF THE**

**OHIO CONSTITUTION BY ALLOWING DEPUTIES TO TESTIFY ABOUT NIKKI'S STATEMENTS THAT HE HAD SEX WITH [S.S.]. [COUNTS 1-3 AND 41-43]**

**ASSIGNMENT OF ERROR NO. X**

**THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT AND VIOLATED HIS RIGHT TO CONFRONTATION UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION BY ALLOWING DEPUTIES TO TESTIFY ABOUT NIKKI'S STATEMENTS ABOUT THE VIDEO ON HIS CELL PHONE. [COUNTS 51 AND 77].**

{¶86} In his ninth assignment of error, Howard argues that the trial court violated the Confrontation Clause by allowing Detective Miller and Major Corwin to testify that Nikki stated: (1) S.S. admitted having sex with Howard; and (2) Howard admitted something happened but would not be specific about what had happened. Similarly, Howard argues in his tenth assignment of error that the trial court violated the Confrontation Clause by allowing Deputy Scheiderer and Major Cline to testify that Nikki stated that Howard had a video of S.S. dancing, wearing only a towel on her head.

{¶87} The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that: "* * * [i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." *Crawford v. Washington* (2004), 541 U.S. 36, 38, 124 S.Ct. 1354, 158 L.Ed.2d

177. Similarly, Section 10, Article I of the Ohio Constitution provides that: "[i]n any trial, in any court, the party accused shall be allowed * * * to meet the witnesses face to face."

{¶88} The question of whether a criminal defendant's rights under the Confrontation Clause have been violated is a question of law reviewed de novo. *State v. Turks*, 3d Dist. Nos. 1-10-02, 1-10-26, 2010-Ohio-5944, ¶11, citing *State v. Keith*, 3d Dist. Nos. 1-06-46, 1-06-53, 2007-Ohio-4632, ¶49, citing *United States v. Robinson* (C.A.6, 2004), 389 F.3d 582, 592. Since Howard failed to object to the testimony at trial on Confrontation Clause grounds, we review for plain error. *Turks*, 2010-Ohio-5944, at ¶11, citations omitted. The plain error standard has been previously set forth above.

{¶89} Howard has failed to demonstrate plain error here. Nikki's statement concerning Howard's cell phone video of S.S. was not hearsay since Nikki was a co-conspirator as to the tampering with evidence charge. Evid.R. 801(D)(2)(e). As such, the admission of Nikki's statements did not violate the Confrontation Clause. *State v. Braun*, 8th Dist. No. 91131, 2009-Ohio-4875, ¶¶114-118. Aside from that, as previously mentioned Nikki's statements were not the only evidence that Howard created the video of S.S., so we are not persuaded that the result of the trial would have *clearly* been different without Nikki's statements being admitted.

{¶90} With respect to Nikki's statements to law enforcement that S.S. admitted having sex with Howard, and Howard admitted "something" happened, we cannot conclude that their admission constituted plain error in this case. Even assuming that the trial court erred by admitting these statements, we are not persuaded that the results of the trial would have been *clearly* different. Nikki's statements that S.S. admitted having sex with Howard was merely cumulative since S.S.'s prior statements concerning her sexual activity with Howard were admitted into evidence through multiple other witnesses. Furthermore, Christi testified that she received a text message from Nikki indicating that S.S. had sex with Howard. Likewise, the fact that Nikki stated that Howard admitted "something" happened was merely cumulative in light of the evidence presented concerning Howard's adverse reactions to S.S.'s admission of them having sex, i.e. Howard's act of slamming his head into glass and threatening to commit suicide. As we stated before, the jury could infer an implicit admission of guilt from Howard's immediate and strong reaction. Aside from that, the jury was presented with several other pieces of evidence, albeit mostly circumstantial, from which they could have found Howard guilty of rape and gross sexual imposition.

{¶91} Howard's ninth and tenth assignments of error are, therefore, overruled.

**ASSIGNMENT OF ERROR NO. XI**

**DEFENDANT-APPELLANT RECEIVED PREJUDICIAL INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS SIXTH AND FOURTEENTH AMENDMENTS RIGHTS, AS WELL AS HIS RIGHTS UNDER SECTION 10, ARTICLE I, OHIO CONSTITUTION.**

{¶92} In his eleventh assignment of error, Howard argues that his trial counsel was ineffective for failing to preserve his Confrontation Clause arguments with respect to assignments of error nine and ten on appeal. We disagree.

{¶93} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole* (2001), 92 Ohio St.3d 303, 306, 750 N.E.2d 148, citing *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶94} Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie* (1998), 81 Ohio St.3d 673, 675, 693 N.E.2d 267. Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Carter* (1995), 72 Ohio St.3d 545, 558, 651 N.E.2d 965. Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. See *State v. Bradley* (1989), 42 Ohio St. 3d 136, 141-142, 538 N.E.2d 373, quoting *State v. Lytle* (1976), 48 Ohio St.2d 391, 396, 358 N.E.2d 623.

**{¶95}** Prejudice results when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Bradley*, 42 Ohio St.3d at 142, citing *Strickland*, 466 U.S. at 691. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Bradley*, 42 Ohio St.3d at 142; *Strickland*, 466 U.S. at 694.

**{¶96}** Howard has failed to demonstrate ineffective assistance of trial counsel. To begin with, this Court has recognized that trial counsel's failure to object to testimony based upon the Confrontation Clause, like other objections, is a matter of trial strategy, and therefore, not ineffective assistance. *Turks*, 2010-Ohio-5944, at ¶44. Furthermore, we have already determined that the trial court did not err in admitting Nikki's statements regarding Howard's cell phone video of S.S. since those statements were admissible pursuant to Evid.R. 801(D)(2)(e), and therefore, trial counsel was not ineffective for failing to object as to those statements. With regard to Nikki's statements concerning S.S.'s admission of having sex with Howard and that Howard admitted "something" happened, we cannot conclude that, but for their admission, the result of the proceeding would have been different. As such, Howard has failed to demonstrate prejudice resulting from trial counsel's alleged error to sustain his ineffective assistance claim.

**{¶97}** Howard's eleventh assignment of error is, therefore, overruled.

## ASSIGNMENT OF ERROR NO. XII

**THE COMBINATION OF THE AFOREMENTIONED ERRORS ARE SUFFICIENT TO CALL INTO QUESTION THE VALIDITY OF THE VERDICT, PREVENTING APPELLANT FROM OBTAINING THE FAIR TRIAL GUARANTEED BY THE FIFTH AND SIXTH AMENDMENTS TO THE U.S. CONSTITUTION AS MADE APPLICABLE TO THE STATES BY THE FOURTEENTH AMENDMENT, AND ARTICLE ONE, SECTIONS TEN AND SIXTEEN OF THE OHIO CONSTITUTION.**

{¶98} In his twelfth and final assignment of error, Howard argues that he was deprived a fair trial because of the multiple errors that occurred in this case. We disagree. "The failure to establish multiple instances of harmless error makes the doctrine of cumulative error inapplicable." *State v. Hupp*, 3d Dist. No. 1-08-21, 2009-Ohio-1912, ¶33. Since Howard has failed to demonstrate error herein, he has also failed to demonstrate cumulative error.

{¶99} Howard's twelfth assignment of error is, therefore, overruled.

{¶100} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ROGERS, P.J. and SHAW, J., concur.**