[Cite as *State v. Bright*, 2014-Ohio-982.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                  CASE NO.  13-13-30

    v.

DARRYL G. BRIGHT II,               O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Trial Court No. 13 CR 0022

**Judgment Affirmed**

**Date of Decision:   March 17, 2014**

APPEARANCES:

    *Kent D. Nord* **for Appellant**

    *Brian O. Boos*  **for Appellee**

**PRESTON, J.**

{¶1} Defendant-appellant, Darryl G. Bright, II, appeals the Seneca County Court of Common Pleas' judgment entry of conviction and sentence. We affirm.

{¶2} On February 6, 2013, the Seneca County Grand Jury indicted Bright on seven counts, including: Counts One, Two, Three, and Five of breaking and entering, violations of R.C. 2911.13(A), (C) and fifth-degree felonies; Count Four of receiving stolen property in violation of R.C. 2913.51(A), (C), a fifth-degree felony; Count Six of theft in violation of R.C. 2913.02(A)(1), (B)(6), a third-degree felony; and, Count Seven of illegal processing of drug documents in violation of R.C. 2925.23(C)(2), (F), a fifth-degree felony. (Doc. No. 2).

{¶3} On February 28, 2013, Bright entered pleas of not guilty at arraignment. (Doc. No. 16).

{¶4} On April 9, 2013, Bright filed a motion for separate trials. (Doc. No. 24). On April 12, 2013, the State filed a memorandum in opposition. (Doc. No. 25). On April 15, 2013, Bright filed a response. (Doc. No. 26).

{¶5} On May 6, 2013, the trial court held a hearing on the motion for separate trials, and, thereafter, denied the motion. (Doc. No. 28).

{¶6} On June 4, 2013, Bright filed a motion in limine to exclude his prior criminal history from trial. (Doc. No. 37).

{¶7} On June 17-18, 2013, a jury trial was held. The trial court granted Bright's motion in limine, with the exception that the parties stipulated to the fact that Bright had a previous felony drug conviction. (Doc. No. 44); (Stipulation No. 1); (June 17-18, 2013 Tr. Vol. I at 125-126). The jury found Bright guilty on all counts. (Doc. Nos. 45-51); (June 18, 2013 JE, Doc. No. 52). Thereafter, the trial court sentenced Bright to 11 months imprisonment each on Counts One, Two, Three, and Five; 10 months imprisonment each on Counts Four and Seven; and, 30 months imprisonment on Count Six. (June 18, 2013 Sentencing Tr. at 29); (June 24, 2013 JE, Doc. No. 53). The trial court further ordered that Bright serve the terms imposed for Counts One, Two, Three, Five, and Six consecutively to each other; and, the terms imposed for Counts Four and Seven concurrently to all the other terms, for an aggregate sentence of 74 months. (*Id.*); (*Id.*).

{¶8} The trial court filed its judgment entry of sentence on June 24, 2013, and Bright filed his notice of appeal on July 23, 2013. (Doc. Nos. 53, 60). Bright raises three assignments of error on appeal.

### Assignment of Error No. I

**The conviction in the trial court should be reversed because the evidence was insufficient and because the decision was against the manifest weight of the evidence and because the evidence supporting it was insufficient as a matter of law to prove the conviction beyond a reasonable doubt.**

{¶9} In his first assignment of error, Bright argues that his breaking and entering convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. In particular, Bright argues that the State failed to produce any evidence that he was at the crime scenes. Bright argues that had law enforcement conducted a thorough investigation, they would have concluded that the evidence failed to indicate each of the breaking and entering incidents were committed by the same person.

{¶10} When reviewing the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus.

{¶11} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact

appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).

{¶12} The criminal offense of breaking and entering is codified in R.C. 2911.13, which provides, in pertinent part: "No person by force, stealth, or deception, shall trespass in an unoccupied structure, with purpose to commit therein any theft offense, as defined in section 2913.01 of the Revised Code, or any felony." R.C. 2911.13(A).

{¶13} Eleven witnesses testified for the State. Lieutenant Jason Windsor of the Tiffin Police Department testified that, between December 2012 and January 2013, Picture Perfect Studio, Ed Lape Insurance, Welty Insurance, and Dr. Salem's Office—businesses located on the west side of town along West Market Street—were all victims of break-ins. (June 17-18, 2013 Tr. Vol. I at 101-102). Windsor testified that law enforcement successfully traced a Marathon gas card stolen from Welty Insurance to Al's Convenience Store where they obtained video surveillance footage of the individual who used the debit card. (*Id.* at 103-104). Windsor testified that the gas card was used the same morning Welty Insurance reported the break-in. (*Id.* at 105). Windsor identified Bright as the individual in the video surveillance footage using the stolen gas card. (*Id.* at 106). Windsor identified State's exhibit one as a CD containing three surveillance videos depicting Bright's vehicle, a blue Dodge Durango, in the parking lot, and Bright

entering Al's Convenience Store, which videos were played for the jury. (*Id.* at 107-108). Windsor identified State's exhibit two as a still image of Bright entering Al's Convenience Store. (*Id.* at 109). Windsor testified that, after identifying Bright from the surveillance video, law enforcement confirmed his address and observed the blue Dodge Durango in the driveway. (*Id.* at 110-111).

{¶14} Windsor testified that, based upon the aforementioned information, law enforcement searched Bright's residence on January 22, 2013. (*Id.*). Windsor testified that law enforcement found in Bright's bedroom a Bose radio that was taken from Ed Lape's State Farm Insurance office. (*Id.* at 112). Windsor testified that he called Ed's wife during the search, and she provided him with the matching serial number to the Bose radio recovered from Bright's bedroom. (*Id.* at 117-118). Bright claimed that he received the radio from Tim DeRose, but DeRose denied giving Bright the radio, according to Windsor. (*Id.* at 118). Windsor identified State's exhibit 15 as a photograph of Bright's bedroom depicting the stolen radio. (*Id.* at 119).

{¶15} Windsor further testified that he located a family photograph belonging to Rob Ledwedge, the owner of Picture Perfect, in some garbage on the back porch of Bright's residence. (*Id.* at 112). Windsor testified that they discovered numerous CD's and a brown box containing Herkimer diamonds, which were items that Ledwedge listed as stolen from his business. (*Id.* at 113).

Windsor identified several photographs of stolen items located at Bright's residence, including: the Ledwedge family photograph (State's Ex. 3); CDs belonging to Picture Perfect (State's Exs. 4-5); a cash box and cash box tray (State's Exs. 6-7); and, a brown jewelry box containing crystals (State's Ex. 8).

{¶16} Windsor also testified that law enforcement located within Bright's residence: a Honeywell programmable thermostat, three brand new, never opened leather chairs, 20-24 vials of Lidocaine, a prescription drug pad, and a rubber signature stamp, and hypodermic needles—all items stolen from Dr. Salem's office. (June 17-18, 2013 Tr. Vol. I at 114-115). Windsor identified photographs of these items, found at Bright's residence. (*Id.* at 115-117); (State's Exs. 9-14).

{¶17} Windsor testified that law enforcement also recovered two pairs of shoes from Bright's residence for comparison with shoeprints found at the scene of the Welty Insurance break-in. (June 17-18, 2013 Tr. Vol. I at 119). Windsor identified State's exhibit 17 as one of the two pairs of shoes taken from Bright's residence; State's exhibit 16 as a photograph of the shoeprint in the snow near Welty Insurance; and, State's exhibit 18 as a box of shoeprint castings collected for lab tests. (*Id.* at 120).

{¶18} Windsor testified that Bright's girlfriend indicated that Bright had been staying between the residence they just searched and his grandmother's residence. (*Id.* at 121-122). Windsor testified that, based upon this information,

law enforcement searched the grandmother's home, but did not locate any stolen property within her home. (*Id.*).

{¶19} Windsor testified that law enforcement located blood at the scene of the Welty Insurance break-in, which they used to identify Nathanial A. Schroth as a suspect. (*Id.* at 122-123).[1] According to Windsor, Schroth was cooperative with the investigation and returned a camera (photographed in State's exhibit 19) that Schroth claimed he had taken from the business. (*Id.* at 123-124). Windsor testified that he discovered pictures of Scott Welty still on the camera. (*Id.* at 124-125).

{¶20} Windsor further testified that Bright had a prior felony drug conviction. (*Id.* at 125). At that point, the parties read to the jury Stipulation Number 1 concerning Bright's prior felony drug conviction. (*Id.* at 126). Concerning the similarities between the four break-ins, Windsor testified that all the businesses were within a short distance of each other and from Bright's residence; that law enforcement found pry marks of similar sizes at several of the break-ins; that law enforcement found property from each of the break-ins in Bright's possession; and, that the shoeprint located in the snow near Welty Insurance matched the shoe size and tread pattern of Bright's shoes. (*Id.* at 126-127).

---

[1] The parties stipulated that the blood recovered from the Welty Insurance break-in was that of Nathaniel A. Schroth. (Stipulation No. 2); (June 17-18, 2013 Tr. Vol. I at 123).

**{¶21}** On cross-examination, Windsor testified that law enforcement did not perform testing on the doors of the businesses that were broken into, because law enforcement never recovered any pry tools for comparison. (*Id.* at 131, 140). He testified that initially, Schroth lied to him and denied his involvement in the break-ins until Windsor confronted Schroth with the DNA evidence from the blood recovered at the scene. (*Id.* at 134). Windsor testified that Schroth had not been charged with anything but would be charged with breaking and entering. (*Id.* at 135). No plea agreement had been worked out for Schroth, according to Windsor. (*Id.*). Windsor testified that the report from the Bureau of Criminal Identification and Investigation ("BCI") indicated that the shoeprints at the scene of the crime were "the same size, tread pattern" as Bright's shoes, but did not definitively conclude the print was made from Bright's shoes. (*Id.* at 136-137).

**{¶22}** Windsor testified that pry tools are used more often in break-ins than merely kicking doors in. (*Id.* at 139). Windsor testified that he did not believe that the door at Picture Perfect had pry marks, though he could not recall because he did not process that scene. (*Id.* at 140). Windsor testified that, during the surge of break-ins during December 2012 to January 2013, three to four other businesses were broken into and seven to eight garages. (*Id.* at 141). Windsor testified that one of these other break-ins was the West Market Street Salon, which is less than two blocks from Bright's residence, and some of the garages were three or four

blocks away from Bright's residence. (*Id.* at 142). Windsor testified that law enforcement never found any fingerprints or DNA at the crime scenes that matched Bright. (*Id.* at 143). He also testified that law enforcement did not have any videos or pictures of Bright at any of the crime scenes. (*Id.*). Windsor further testified that he found an empty prescription bottle for Tim DeRose in the trash on Bright's back porch. (*Id.* at 143-144).

{¶23} On re-direct, Windsor testified that, over his seventeen years in law enforcement, he has never had a case where the pry tool was discovered, because criminals know law enforcement can compare the damage to the tools. (*Id.* at 144).

{¶24} Donna Bouillon, an employee of Ed Lape State Farm Insurance, testified that, when she entered the office on December 21, 2012, she noticed the office was a little messy, so she called Ed Lape, who indicated that he had not been in the office. (*Id.* at 153). Bouillon testified that she then looked at the cash drawer and realized they had been robbed. (*Id.* at 155). Bouillon testified that three cameras, a Bose radio, the cash drawer, and a can of change were missing from the office. (*Id.* at 155). Bouillon testified that the back door was broken and there was a shoe print on the door. (*Id.* at 156). Bouillon identified the garbage can appearing in a photograph of Bright's residence as the same one owned by her office. (*Id.* at 156-157); (State's Ex. 8). She also testified that approximately

$200 in cash was stolen from the cash drawer. (June 17-18, 2013 Tr. Vol. I at 157). Bouillon testified that the radio photographed in State's exhibit fifteen appeared to be the one from their office. (*Id.* at 158). She testified that the radio has since been returned to the office. (*Id.*).

{¶25} Tiffin Police Sergeant Robert Bour testified that he investigated the break-in at Ed Lape State Farm and initially spoke with Donna at the scene. (*Id.* at 159-161). Bour testified that he observed damage to the entryway door of the office and observed some rooms in the office where things were "rifled through and things laying around." (*Id.* at 162). Bour testified that he was not successful in his attempts to secure latent fingerprints at the scene, but he did collect some plastic candy wrappers for potential DNA evidence. (*Id.*). Bour testified that the BCI analyst failed to produce anything of value to this case. (*Id.* at 163). Bour identified State's exhibits 21 through 35 as photographs he took of the crime scene, including: the rear of the business (State's Exs. 21-22); the damaged doorway of the business (State's Exs. 23-25); the inside door leading to the business (State's Exs. 26-27); rooms within the business, some with items scattered around (State's Exs. 28-33); the front entryway (State's Ex. 34); and just inside the front door of the business (State's Ex. 35). (June 17-28, 2013 Tr. Vol. I at 165-166). Bour further testified that he helped with the investigation at Welty Insurance, and law enforcement located blood on a digital camera box, as well as

footprints at the rear of the business. (*Id.* at 166-167). Bour testified that he photographed and collected the blood and created an impression of the shoeprint for analysis at BCI. (*Id.* at 167).

{¶26} Robert Ledwedge, the owner of Picture Perfect Photo and Frame, testified that, on the morning of December 2, 2012, he entered his business and discovered a camera bag and laptop were missing. (*Id.* at 171-173). Ledwedge testified that he then noticed the cash register had been broken into, so he called the police. (*Id.* at 173). Upon further inspection, Ledwedge discovered that a cordless drill, a brown box containing Herkimer diamonds, and a couple stacks of CDs were also missing. (*Id.* at 174). Ledwedge testified that his family portrait, photographed in State's exhibit three, was in the camera bag that was stolen, and these items have been subsequently returned to him. (*Id.* at 175). Ledwedge testified that the cash box and cash drawer photographed in State's exhibits six and seven were items stolen from his business and subsequently returned by law enforcement. (*Id.* at 175-176). Ledwedge testified that the little wooden box photographed in State's exhibit eight belonged to him, and he had Herkimer diamonds—which are quartz crystals from Herkimer, New York that resemble actual diamonds—inside of the box. (*Id.* at 176-177). Ledwedge testified that the CDs photographed in State's exhibits four and five also belonged to the business. (*Id.* at 177).

**{¶27}** Tiffin Police Officer Rachel Nye testified that she was dispatched to Picture Perfect regarding a break-in. (*Id.* at 178-180). Nye testified that she identified pry marks and damage to the north entry door of an adjoining building owned by Molyet's Popcorn Production Facility. (*Id.* at 181-182). She determined that the suspects exited the building through the south entrance of Picture Perfect. (*Id.* at 181-182). Nye testified that she photographed a partial shoeprint that was found on the tile floor near the cash register. (*Id.* at 182). Nye identified State's exhibits 36 through 47 as photographs of the business, including: the front of the building (State's Ex. 36); the damaged north side entrance door (State's Exs. 37-39); the main room of the business (State's Ex. 40); the closet from which the cash box was stolen (State's Exs. 41-42); the cash register with all the cash gone (State's Ex. 43); the partial shoeprint (State's Ex. 44); the owner's office with an opened cardboard box (State's Ex. 45); the studio (State's Ex. 46); and, the south entrance where the suspects exited the building (State's Ex. 47). Nye testified that the shoeprints were not visible to the naked eye; rather, law enforcement used dust to capture the prints. (June 17-18, 2013 Tr. Vol. I at 187).

**{¶28}** On cross-examination, Nye testified that Molyet employees did not think the damage to their entry door was new damage, but the manager later indicated otherwise. (*Id.* at 188-189). On re-direct, Nye testified that the pry marks were behind the door plate, so they were not readily obvious when she first

approached the door. (*Id.* at 190-191). On re-cross, Nye testified that she asked the Molyet employee if she saw any new damage to the door, but Nye did not point out the damage when she asked the employee this question. (*Id.* at 192).

{¶29} Scott Welty, the owner of Welty Financial Services, testified that Bright is not one of his customers. (*Id.* at 194-196). Welty testified that on the morning of January 8, 2013, a neighbor called and informed him that the glass to the business door was broken, so he called an employee who lived in Tiffin to go to the business and wait for the police. (*Id.*). Welty testified that the business was ransacked and there was damage to the back and front doors. (*Id.* at 197). He discovered that $150 in cash, one diamond earring, two cameras, a Marathon gas card, some scratch-off lottery tickets, and gifts of wine and champagne were missing. (*Id.* at 197-198). Welty identified State's exhibit 19 as the camera that was stolen from his business. (*Id.* at 198). Welty testified that he used the Marathon gas cards and lottery tickets as rewards for individuals who refer business to his agency. (*Id.*). Welty testified that the gas cards are each issued a unique number and operate like a credit card. (*Id.*). Welty testified that he keeps the receipts for each of the gas cards in his office, and he provided law enforcement the receipt for the gas card that was stolen. (*Id.* at 199).

{¶30} Lieutenant Mark Marquis testified that he investigated the break-in at Welty Insurance and immediately noticed that the glass portion of the front door to

the business was shattered. (*Id.* at 201-203). Marquis testified that he also noticed that the door had pry marks on the wood framing along the right side of the door. (*Id.* at 203). Marquis testified that the business was ransacked, and he noticed further damage to the back door, including pry marks. (*Id.* at 204). Marquis testified that they discovered footprints in the snow leading up to and away from the business, and later discovered blood on a camera box inside the business. (*Id.*). Marquis identified State's exhibits 48 through 59 as photographs of the crime scene at Welty Insurance, including: the front door (State's Ex. 48); the inside of the business towards the back door (State's Ex. 49); the back door with the weather stripping removed and broken door handle (State's Ex. 50); the right-hand edge of the rear door and a pipe Welty Insurance used to reinforce the back door (State's Ex. 51); a close-up of the weather stripping that had been removed from the exterior side of the rear door (State's Ex. 52); a cinder block that was used to hit the back door (State's Ex. 53); two different shoeprints found in the snow (State Exs. 54-55); the blood located on parts of the camera box (State's Exs. 56-58); and, a picture of a ransacked desk (State's Ex. 59).

{¶31} Marquis testified that Marathon credit services informed him that the stolen gas card was used at 9:52 a.m. the morning of the break-in at Al's Convenience Store on West Market Street. (June 17-18at 208-209). He testified that he provided this information to Detective Windsor to review surveillance

footage from the store around that same time. (*Id.* at 209). Marquis testified that between December 2012 and January 2013 there was a substantial increase in the number of businesses that were victims of break-ins. (*Id.* at 209-211, 216, 219). Marquis testified that, after Bright's home was searched, however, the number of break-ins into businesses sharply decreased. (*Id.* at 211, 219).

{¶32} Daniel Davison, a BCI forensic scientist, testified that she compared the photographed shoeprint impressions with shoes that were submitted by law enforcement for this case. (June 17-18, 2013 Tr. Vol. II at 233-238 ). Davison testified that one of the shoeprints had the same tread size and shape as the left shoe that was submitted as Item Number 1; and one of the shoeprints had the same tread size and tread shape as both of the shoes submitted as Item Number 1. (*Id.* at 238-239). Davison identified State's exhibit 60 as a copy of her report containing these findings. (*Id.* at 242-243). On cross-examination, Davison testified that she could not say that the shoeprint was exclusively made by the particular shoe provided by Bright. (*Id.* at 243).

{¶33} Dr. Salem testified that, on the morning of January 17, 2013, he went to his office and noticed that his desk was messed up, books and papers were on the floor, and drawers were open. (*Id.* at 258-259). Dr. Salem testified that he then went in a couple examination rooms where he found the medicine cabinet open with syringes on the floor, at which point he realized that someone broke into

his business, so he called the police. (*Id.* at 259-260). Dr. Salem testified that he was missing prescription pads, a rubber stamp with his name on it, a box of Lidocaine, a brand new thermostat, and three brand new office chairs still in the boxes. (*Id.* at 261). Dr. Salem identified State's exhibit 9, taken from Bright's residence, as the Lidocaine vials, the prescription pad and rubber stamp with his name on it—all items he reported stolen. (*Id.* at 262-263). Dr. Salem also identified the stolen syringes (State's Ex. 10); the stolen chairs (State's Ex. 11); and, the stolen thermostat (State's Ex. 12). (June 17-18, 2013 Tr. Vol. II at 266-267).

{¶34} Nathaniel Schroth testified that this past winter, Bright asked him to do something illegal, and the two of them went to Welty Insurance, where they tried to gain entrance through the back door, but it was barricaded with a steel pipe. (*Id.* at 268, 271-272). Schroth testified that, after they broke out the glass from the front door with a pry bar, he crawled into the business and opened the door for Bright. (*Id.* at 272). Schroth testified that they took a couple cameras, around $100 in cash, and a few bottles of alcohol. (*Id.* at 273). According to Schroth, they returned to Bright's residence where he took half the cash, a camera, and the alcohol. (*Id.*). Schroth testified that he remembered cutting himself. (*Id.*). He also remembered talking to Lieutenant Windsor about the incident and returning some of the property. (*Id.*).

{¶35} On cross-examination, Schroth testified that DeRose introduced him to Bright, and Schroth gave law enforcement the shoes he thought he was wearing during the break-in. (*Id.* at 274). Schroth testified that Windsor looked around his place when he came to pick up the camera and his shoes, but Windsor did not have a search warrant. (*Id.* at 275). Schroth testified that he discussed testifying against Bright with law enforcement but denied ever asking for favors. (*Id.* at 276). He admitted that he originally denied his involvement in the Welty Insurance break-in to Windsor. (*Id.*). Schroth testified that they used his pry bar, but he left the pry bar at Bright's house after they finished. (*Id.* at 277). Schroth denied that DeRose was involved in the Welty Insurance break-in or any other break-ins. (*Id.* at 278).

{¶36} On re-direct, Schroth denied that law enforcement or the prosecution ever promised him anything in return for his testimony. (*Id.* at 279). Schroth testified that, weeks prior to the Welty Insurance break-in, he let Bright borrow his pry bar, so the pry bar was at Bright's residence before they used it to break into Welty Insurance. (*Id.* at 279-280). Schroth testified that he left the pry bar at Bright's house when they finished the Welty Insurance break-in. (*Id.* at 280).

{¶37} Tiffin Police Officer Michael Moore testified that, on January 17, 2013, he was dispatched to Dr. Salem's office regarding a break-in. (*Id.* at 281-282). Moore testified that the suspect used a pry tool to gain entrance through the

back door, which was located in an alley. (*Id.* at 282-283). Moore identified State's exhibits 61 through 78 as photographs of the scene, including: the front entrance of the office (State's Ex. 61); the back alley to the doctor's office (State's Ex. 62); the damaged back door to the office (State's Exs. 63-65); the empty portion of the doctor's office where the subject entered and proceeded to Dr. Salem's actual office (State's Ex. 66); Dr. Salem's name plate on the office door (State's Ex. 68); pry marks on the inside main entrance to his office (State's Exs. 69-70); a view of West Market Street from inside the front entrance of Dr. Salem's office (State's Ex. 71); open drawers behind the front desk of the office (State's Ex. 72); open shelves and disheveled papers in the hallway behind the front desk (State's Ex. 73); a view of the inside of Dr. Salem's office, papers on the ground, and messy desk (State's Ex. 74); an electric thermometer and box where missing Lidocaine should be on Dr. Salem's office desk (State's Ex. 75); another hallway with things scattered on the floor (State's Ex. 76); inside one of the rooms in the office with an open shelf where the syringes are stored (State's Ex. 77); and, the syringes and items laying on the floor of the examination room (State's Ex. 78). (June 17-18, 2013 Tr. Vol. II at 284-286).

{¶38} Thereafter, the State moved for the admission of its exhibits and then rested. (*Id.* at 295). Bright made a Crim.R. 29(A) motion for acquittal, which was

denied. (*Id.* at 296-297). The jury found Bright guilty on all charges. (June 18, 2013 Sentencing Tr. at 2-4).

{¶39} After reviewing the aforementioned testimony, along with the admitted exhibits, we conclude that Bright's conviction was supported by sufficient evidence. The evidence placing Bright at the scene of the several break-ins was multifaceted. The fact that Bright had a family photograph of Robert Ledwedge supports the finding that Bright broke into the businesses, ransacking and taking everything he could carry of apparent value to separate out the valuables later. Law enforcement recovered multiple items from each of the break-ins in Bright's home during a lawful search. Footprints in the snow outside of the Welty Insurance building were consistent with the tread size and pattern of Bright's shoes. Bright used a Marathon gift card that was stolen from Welty Insurance within hours after the business had been broken into. Schroth implicated Bright in the Welty Insurance break-in, and Schroth testified that he allowed Bright to borrow a pry bar several weeks prior to that break-in and afterwards, as well. The suspect's modus operandi for the several break-ins was consistent—bust into the rear entrance door of an empty business building using a pry bar. Law enforcement testified that after Bright was in custody, the surge of break-ins declined dramatically. We are also not persuaded that Bright's

conviction was against the manifest weight of the evidence, because of the overwhelming and multifaceted nature of the evidence against him.

**{¶40}** Bright's first assignment of error is, therefore, overruled.

### Assignment of Error No. II

**The trial court erred when it overruled Defendant/Appellant's motion for separate trials.**

**{¶41}** In his second assignment of error, Bright argues that the trial court erred by denying his motion for separate trials because the evidence from each location or victim would not have been admissible in trials for the other locations or victims, and the evidence of each crime was not simple and distinct.

**{¶42}** Crim.R. 8(A) permits the joinder of multiple charges against a defendant if the charges "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Moreover, "[i]t is well settled that the law favors joinder." *State v. Waddy*, 63 Ohio St.3d 424, 429 (1992), superseded by constitutional amendment as stated in *State v. Smith*, 80 Ohio St.3d 89 (1997). *See also State v. Howard*, 3d Dist. Marion No. 9-10-50, 2011-Ohio-3524, ¶ 80.

**{¶43}** When a defendant claims that he was prejudiced by the joinder of multiple offenses, a court must determine: (1) whether evidence of the other crimes would be admissible even if the counts were severed; and (2) if not,

whether the evidence of each crime is simple and distinct. *State v. Schaim*, 65 Ohio St.3d 51, 59 (1992), citing *State v. Hamblin*, 37 Ohio St.3d 153, 158-159 (1988). Moreover, "[i]f the evidence of other crimes would be admissible at separate trials, any 'prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that possible in separate trials,' and a court need not inquire further." *Id.* at 59, quoting *Drew v. United States*, 331 F.2d 85, 90 (C.A.D.C.1964).

{¶44} Whether to grant a motion for severance of counts is left to the discretion of the trial court and such a decision will not be disturbed absent a showing of an abuse of discretion. *State v. Barstow*, 4th Dist. Hocking No. 02CA27, 2003-Ohio-7336, ¶ 53. An abuse of discretion connotes more than just an error in judgment; rather, it implies an arbitrary, unreasonable, unconscionable attitude on the part of the trial court. *State v. Adams*, 62 Ohio St.2d 151, 152 (1980).

{¶45} The several breaking and entering charges were of the same or similar character in this case. During the search of Bright's property, items from all four break-ins was recovered. All of the locations were in close proximity to each other and Bright's house; all of the break-ins occurred within the same two-month period; and, all of the break-ins were accomplished using a pry tool to gain entrance to the rear door of the businesses, with the exception of Welty Insurance

where Bright and Schroth attempted but failed to pry open the back door due to a pipe securing the back door. Given the similarities between each of the break-ins, the evidence of the other break-ins would have been admissible in the separate trials under Evid.R. 404(B). *See, e.g., State v. Brewer*, 3d Dist. Wyandot No. 16-11-13, 2012-Ohio-3899, ¶ 33 (trial court did not abuse its discretion by allowing testimony concerning defendant-appellant's prior breaking and entering conviction under Evid.R. 404(B) since it was offered to show a "unique, identifiable plan of criminal activity" to establish defendant-appellant's identity). *See also State v. Elersic*, 11th Dist. Lake Nos. 2000-L-062 and 2000-L-164, 2001 WL 1497192, * 10 (Nov. 21, 2001) (defendant-appellant's use of pry tools, cutting phone lines, and stealing a safe in the prior breaking and entering was sufficiently similar for admission under Evid.R. 404(B) in the subsequent case). In light of these facts, the trial court did not abuse its discretion by denying the motion to sever.

{¶46} Bright's second assignment of error is, therefore, overruled.

### Assignment of Error No. III

**The trial court erred when it overruled Appellant's objection and permitted Lieutenant Mark Marquis to testify about criminal activity that occurred in the City of Tiffin after the Tiffin Police Department executed a search warrant at the home of Defendant/Appellant on January 22, 2013.**

{¶47} In his third assignment of error, Bright argues that the trial court abused its discretion by allowing Lieutenant Mark Marquis to testify concerning

the drop in breaking and entering incidents in Tiffin. Bright argues that this evidence was irrelevant and inadmissible under Evid.R. 404(B).

{¶48} "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Evid.R. 404(B).

{¶49} A trial court's decision to allow testimony will not be reversed absent an abuse of discretion and material prejudice to the defendant. *State v. Long*, 53 Ohio St.3d 91, 98 (1978).

{¶50} Here, the trial court permitted Marquis to testify that the police department noted a substantial increase in breaking and entering offenses during December 2012 and January 2013. Thereafter, Marquis testified, over defendant-appellant's objection, that after Bright's residence was searched on January 22, 2013, there was a significant decrease in the number of these types of break-ins. Contrary to Bright's argument, this evidence is relevant to show identity, i.e. that Bright committed the several, indicted breaking and entering offenses.

{¶51} Bright also argues that this testimony violated Evid.R. 404(B); however, this rule has no bearing on the testimony at issue. Even if the rule was

applicable, Marquis' testimony would have been admissible to show identity, as we already noted. Consequently, the trial court did not abuse its discretion by allowing the aforementioned testimony. Furthermore, even if we were to find the admission of this testimony erroneous, the testimony, alone, was not outcome-determinative here, so Bright failed to demonstrate prejudice sufficient to warrant a reversal in this case.

{¶52} Bright's third assignment of error is, therefore, overruled.

{¶53} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, J., concurs, in Judgment Only.**

**ROGERS, J. Concurs in Part and Dissents in Part.**

{¶54} I concur with the opinion of the majority as to the affirmance on Counts One, Six, and Seven. However, I respectfully dissent as to the convictions for Breaking and Entering on Counts Two, Three, and Five.

{¶55} Sufficiency of the evidence is strictly a legal issue to be determined by the court. It does not involve a weighing of the evidence or the credibility of witnesses. It is a determination that the trial court should make, with or without a motion.

Case No. 13-13-39

> It is the duty of a trial court to submit an essential issue to the jury when there is sufficient evidence relating to that issue to permit reasonable minds to reach different conclusions on that issue, or, conversely, to withhold an essential issue from the jury when there is not sufficient evidence relating to that issue to permit reasonable minds to reach different conclusions on that issue.

*O'Day v. Webb*, 29 Ohio St.2d 215 (1972), paragraph four of the syllabus.[2]

**{¶56}** "Whether a sufficiency of the evidence argument is reviewed under a prejudicial error standard or under a plain error standard is academic." *Perrysburg v. Miller,* 153 Ohio App.3d 665, 2003–Ohio–4221, ¶ 57 (6th Dist.), quoting *State v. Brown,* 2d Dist. Montgomery No. 17891 (July 14, 2000). Regardless of the standard used, "a conviction based on legally insufficient evidence constitutes a denial of due process." *State v. Thompkins*, 78 Ohio St.3d 380, 386–87 (1997).

**{¶57}** Because I find no evidence in the record that places Appellant at the scene of the break-ins at Picture Perfect Studio, Ed Lape Insurance, or Dr. Salem's Office, I would sustain the first assignment of error as to those charges.

**{¶58}** Although Appellant argues against the sufficiency of the evidence on all four breaking and entering charges, the testimony of another individual that he participated with Bright in the break-in at Welty Insurance supplies sufficient evidence to allow that charge to go to the jury. The majority has adequately discussed that offense, including the issue of manifest weight of the evidence on that charge. Further, Appellant's arguments fail to specifically address the

---

[2] Although *O'Day v. Webb* was a civil case, the rationale is equally true, even more important, in criminal cases.

convictions for the offenses of receiving stolen property, theft, or illegal processing of drug documents (Counts Four, Six, and Seven); therefore, I will not discuss those Counts.

{¶59} The majority says that the "evidence placing Bright at the scene of the several break-ins is multifaceted." Majority Opin., at ¶ 39. It lists several facts that apply only to the break-in at Welty Insurance and the recovery of property stolen from all four break-ins. It then speculates as to why Bright had some property and suggests the existence of a consistent "modus operandi." However, the majority does not, and cannot, specify any evidence that places Bright at Picture Perfect Studio, Ed Lape Insurance, or Dr. Salem's Office.

{¶60} The recovery of property from the various break-ins would support charges of receiving stolen property. However, the majority's speculation as to why or how Bright acquired some of the stolen property is just that, speculation, and is improper when considering sufficiency of the evidence. Such conjecture constitutes a weighing of the evidence, rather than a determination of the existence of evidence. However, because the majority has engaged in its speculative analysis, I will discuss the same.

{¶61} In conducting its "analysis" the majority cites to the recovery of a Ledwedge family photograph as supporting "the finding that Bright broke into the businesses, ransacking and taking everything he could carry of apparent value to

separate out valuables later." *Id.* The "ransacking and taking" could just as easily have been accomplished by someone else, who then delivered the property to Bright for quick cash, leaving the sorting to Bright.

**{¶62}** As for the existence of a consistent "modus operandi", I do not believe that the mere act of breaking into a building is enough to establish a modus operandi. A modus operandi is a "behavioral fingerprint which, when compared to the behavioral fingerprints associated with the crime in question, can be used to identify the defendant as the perpetrator." *State v. Lowe*, 69 Ohio St.3d 527, 531 (1994). Thus, the modus operandi reveals a "distinct, identifiable scheme, plan, or system" that was used in the commission of the crime. *State v. Smith*, 49 Ohio St.3d 137, 141 (1990). The majority states that Bright's "modus operandi for the several break-ins was consistent–bust into the rear entrance door of an empty business building using a pry bar." Majority Opin., at ¶ 39. However, Lieutenant Windsor testified that the use of pry tools is the most common way to break into buildings. How was utilizing a commonly used method to break into an unoccupied structure distinct or unique to Bright? The mere act of using a pry tool to gain access to a building is not enough to establish modus operandi. *See Lowe*, 69 Ohio St.3d at 532 ("The only arguably common feature of the other acts and the murders is the use of rope—Lowe sometimes tied the girls, and [the victim's] feet were tied together with rope. The use of rope itself does not provide a

distinctive behavioral fingerprint."); *see also State v. Burns*, 11th Dist. Lake No. 2000-L-189, 2002-Ohio-3585, ¶ 35 (finding that the breaking of a window by a large object was not enough to establish modus operandi for the crime of breaking and entering); *State v. Elersic*, 11th Dist. Lake Nos. 2000-L-062, 2000-L-164, 2001-Ohio-8787, * 10 (finding that the cutting of wires that may have been connected to a store alarm was not distinct as to establish the defendant's modus operandi).

{¶63} Finally, the majority finds support in the fact that the number of break-ins apparently lessened after the search of Bright's residence. I find no such solace there. If someone else were doing the actual break-ins and simply selling the property to Bright, the number of break-ins might also be reduced due to the lack of a "fence", or quick means of disposal.

{¶64} Because I find no evidence whatsoever of Bright's entry into Picture Perfect Studio, Ed Lape Insurance, or Dr. Salem's Office, I would sustain in part Appellant's first assignment of error, and vacate the convictions for those three offenses, being Counts Two, Three, and Five.

**/jlr**